SLIP OP. 00-109

# UNITED STATES COURT OF INTERNATIONAL TRADE

————————————————————

| | | |
|---|---|---|
| | **:** | |
| **ALLEGHENY LUDLUM CORP., <u>et al.</u>,** | **:** | |
| | **:** | |
| **Plaintiffs,** | **:** | |
| | **:** | **Before: WALLACH, Judge** |
| **v.** | **:** | **Court No.: 99-06-00361** |
| | **:** | |
| **UNITED STATES,** | **:** | |
| | **:** | **PUBLIC VERSION** |
| **Defendant.** | **:** | |
| | **:** | |

————————————————————

[Plaintiffs' Rule 56.2 Motion For Judgment Upon The Agency Record denied.]

Decided: August 28, 2000

<u>Collier Shannon Scott, PLLC</u> (<u>David A. Hartquist</u>, <u>Paul C. Rosenthal</u>, <u>Kathleen W. Cannon</u>, <u>R. Alan Luberda</u> and <u>John M. Herrmann</u>), for Plaintiffs.

<u>Lyn M. Schlitt</u>, General Counsel; <u>James A. Toupin</u>, Deputy General Counsel; U.S. International Trade Commission, Office of the General Counsel, (<u>Shara L. Aranoff</u>), for Defendant.

## OPINION

## I

## INTRODUCTION

This case is before the court upon Plaintiffs' Rule 56.2 Motion For Judgment Upon The Agency

Record, challenging the decision of the U.S. International Trade Commission ("ITC" or "Commission")

in Certain Stainless Steel Plate From Belgium, Canada, Italy, Korea, South Africa, and Taiwan, Inv.

Nos. 701-TA-376, 377, and 379 (Final) and 731-TA-788-793 (Final), USITC Pub. 3188 (May

1999), 64 Fed. Reg. 25,515 (May 12, 1999) ("Final Determination").  Plaintiffs challenge two aspects

of the Final Determination:  (1) the ITC's decision that cold-rolled stainless steel coiled plate comprises

a "domestic like product" distinct from hot-rolled stainless steel coiled plate; and (2) the ITC's

determination that the U.S. cold-rolled stainless steel plate industry was not materially injured by

imports of stainless steel cold-rolled plate from Belgium and Canada.  For the reasons stated below, the

court affirms the Commission's determination.


**II**

**BACKGROUND**


In response to a petition filed by affected U.S. industry, on May 28, 1998, the ITC published in

the Federal Register a notice of its preliminary determination that there was "a reasonable indication"

that a U.S. industry was materially injured by reason of dumped or  subsidized imports of stainless steel

plate in coils from Belgium, Canada, Italy, Korea, South Africa, and Taiwan.  Certain Stainless Steel

Plate From Belgium, Canada, Italy, Korea, South Africa, and Taiwan, 63 Fed. Reg. 29251 (1998).

Following subsequent findings by the International Trade Administration of the U.S. Department of

Commerce ("Commerce") that such stainless steel plate was, in fact, being subsidized and/or sold at

less than fair value (i.e., "dumped") in the U.S. market, the ITC commenced the final determination that

is the subject of Plaintiffs' challenge.[1]

---

[1] Under the Tariff Act of 1930, U.S. industries may petition for relief from imports that are sold
in the United States at less than fair value ("dumped") or which benefit from subsidies provided through
foreign government programs.  Under the law, Commerce determines whether the dumping or

Two aspects of the Final Determination are relevant.  First, the majority of commissioners[2]

found that two domestic like products corresponded to the imported merchandise (certain stainless

steel plate in coils) that Commerce identified as being dumped and subsidized:  certain hot-rolled

stainless steel plate in coils ("hot-rolled plate") and certain cold-rolled stainless steel plate in coils

("cold-rolled plate").  Final Determination at 7.[3]  In reaching its determination, the ITC noted, inter alia,

that cold and hot-rolled plate have "limited interchangeability and different end uses," that cold-rolling

involves "substantial additional processing steps," that producers and consumers see hot and cold-rolled

plate as separate products, and that prices for cold-rolled plate are generally higher.  Id.  Because it

found hot and cold-rolled plate to be distinct products, the ITC separately investigated whether each of

the domestic industries producing these products had been materially injured by subject imports of

corresponding merchandise.  See id. at 8.

The second relevant aspect of the Final Determination concerns the ITC's finding that the U.S.

---

subsidizing exists and, if so, the margin of dumping or amount of the subsidy. The ITC determines whether the dumped or subsidized imports materially injure or threaten to materially injure the U.S. industry or industries.

[2] Specifically, Vice Chairman Miller and Commissioners Crawford, Hillman, and Askey found two domestic like products, voting in the negative (no injury) with respect to cold-rolled plate.  See Final Determination at 1 n.2.  Chairman Bragg and Commissioner Koplan found one domestic like product, encompassing both hot and cold-rolled plate, that was injured by reason of subject imports. See id.

[3] For purposes of its investigation, the ITC defined hot-rolled plate as "all domestic product corresponding to the scope of [Commerce's] investigations except for certain cold-rolled stainless steel plate in coils."  Id. at 3 n.1.  In turn, the ITC defined cold-rolled plate as "all domestic product corresponding to the scope of these investigations that has undergone a cold-reduction process that reduced the thickness of the steel by twenty-five percent or more, and has been annealed and pickled after cold reduction."  Id.

industry producing cold-rolled plate was not materially injured by imports of cold-rolled plate from

Belgium and Canada.[4]   Although the ITC observed that cumulated imports of subject cold-rolled plate

from these countries had declining average unit values and controlled a large share of the U.S. market, it

nevertheless found little interest by domestic producers in selling cold-rolled plate and no indication that

such imports had depressed domestic cold-rolled plate prices.  Id. at 23-24.  For these and other

reasons, the ITC concluded that the domestic industry producing cold-rolled plate was "not materially

injured by reason of cumulated subject imports of cold-rolled plate from Belgium and Canada."  Id. at

25.[5]

# III

# ANALYSIS

# A

# STANDARD OF REVIEW

In reviewing the Final Determination, the court "shall hold unlawful any determination, finding,

or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).  Substantial evidence is something more

---

[4] Because there were no subject imports of cold-rolled plate from Italy, Korean, South Africa and Taiwan in 1997, the ITC found imports of cold-rolled plate from these countries to be "negligible" for purposes of 19 U.S.C. § 1671d(b) (1994) and 19 U.S.C. § 1677(24) (1994).  Id. at 8 & nn.42 & 43.  The ITC accordingly terminated its investigation with respect to such imports without an injury determination.  Id. at 8-9.  Plaintiffs have not challenged this finding.

[5] In comparison, the Commission found that "subject imports have had a significant adverse effect on the domestic industry producing [hot-rolled] plate."  Id. at 22.  This finding is also not at issue.

than a "mere scintilla," and must be enough evidence to reasonably support a conclusion. Primary Steel, Inc. v. United States, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380 (1993); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Ceramica Regiomontana, S.A., 10 CIT at 404-5, 636 F. Supp. at 966.

**B**

**THE ITC'S LIKE PRODUCT DETERMINATION IS IN ACCORDANCE WITH LAW AND SUPPORTED BY SUBSTANTIAL RECORD EVIDENCE.**

To make an injury determination, the ITC first defines one or more domestic like products that correspond to the dumped or subsidized imports identified by Commerce and, in turn, identifies the industry or industries producing these like products. 19 U.S.C. § 1671d(b) (countervailing duties); 19 U.S.C. § 1673d(b) (1994) (dumped merchandise); see Timken Co. v. United States, 20 CIT 76, 79, 913 F. Supp. 580, 584 ("[I]n determining whether an industry in the United States is materially injured or threatened with material injury by reason of the subject imports, the Commission must first define the 'like product' in order to determine the relevant 'industry.'"). A "domestic like product" is defined as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10) (1994). The relevant "industry," in turn, is defined as the "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."

19 U.S.C. § 1677(4)(A) (1994).

As noted above, in the Final Determination the ITC found that two domestic like products, cold-rolled and hot-rolled plate, correspond to the subject merchandise found by Commerce to be subsidized or dumped into the U.S. market.[6] Plaintiffs advance both legal and factual arguments for why this determination was not in accordance with law or otherwise supported by substantial record evidence. For the reasons set forth below, the court affirms this aspect of the Final Determination.

**1**

**The Commission Did Not Err in Finding Sufficient Domestic Production
to Initiate a Like-Product Analysis for Cold-Rolled Plate.**

Plaintiffs first challenge the like product determination by arguing that the ITC's decision to treat cold-rolled plate as a separate like product is inconsistent with 19 U.S.C. § 1677(7)(C) (1994), which requires the ITC to analyze the volume and price effects of the subject imports, as well as their impact on the production, capacity, sales, profits, employment and investments of the relevant industry. According to Plaintiffs, in order to meaningfully perform such an analysis, "the alleged domestic industry

---

[6] Although the ITC must accept Commerce's determination as to the scope of the imported merchandise found to be subsidized or sold at less than fair value, the Commission determines what domestic product or products is like the imported articles Commerce identified. See Hosiden Corp. v. United States, 85 F.3d 1561, 1567-68 (Fed. Cir. 1996). Accordingly, it is not an abuse of the ITC's authority to define multiple like products which correspond to a single product identified by Commerce. See id. (citing various Court of International Trade decisions recognizing such distinctions); see also Torrington Co. v. United States, 14 CIT 648, 747 F. Supp. 744 (CIT 1990), aff'd 938 F.2d 1278 (Fed. Cir. 1991) (affirming ITC determination of six like products where Commerce found five classes or kinds of subject merchandise).

[for purposes 19 U.S.C. § 1677(4)(A)] must necessarily have more than a de minimis level of domestic production of the product."  Plaintiffs' Reply Brief ("Plaintiffs' Reply" or "Reply") at 2.  Here, Plaintiffs claim, "the record evidence indicates de minimis production and sales of the subject cold-rolled plate" -- a result which, they argue, should have led the ITC to conclude that no domestic cold-rolled plate industry existed.  Id.

The Final Determination shows two bases for the ITC's finding that there was sufficient domestic production to initiate a like-product investigation for cold-rolled plate.  First, the majority of commissioners, after noting that cold-rolled plate "was produced for commercial sale and in response to customer orders . . . during every year of the period of investigation,"[7] provided a "*compare*" citation to, inter alia, its investigation in Extruded Rubber Thread from Malaysia, Inv. No. 753-TA-34, USITC Pub. 3112 (June 1998) ("Extruded Rubber").  Final Determination at 5 & n.18.  In Extruded Rubber, the ITC found that food-grade extruded rubber thread did not constitute a separate domestic like product from other extruded rubber thread ("ERT"), since only small, non-commercial quantities of food-grade ERT had been produced in recent years.  Second, and in a concurring footnote,[8]

---

[7] Plaintiffs do not challenge these facts.

[8] Because it is not identified as such, footnote 19 does not appear to denote a separate, concurring explanation.  At oral argument, however, Defendant's counsel explained that this footnote represents only the view of Commissioner Crawford.  Because footnotes 18 and 19 set out different standards for examining domestic production, because footnote 19 specifically cites Commissioner Crawford's dissent in Extruded Rubber, and because Plaintiffs did not disagree with this explanation, the court accepts counsel's representation as a reasonable reading of footnotes 18 and 19.  See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) ("While [courts] may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (citation omitted).  The Commission, however, is cautioned to carefully note when particular statements represent the views of only specific commissioners, lest administrative and judicial resources be wasted

Commissioner Crawford noted her view that "it is the fact of production -- not the amount -- that determines whether there is domestic production . . . .  Here, admittedly there is actual domestic production of cold-rolled plate."  <u>Final Determination</u> at 5-6 n.19 (citing Commissioner Crawford's dissenting views from <u>Extruded Rubber</u>).

19 U.S.C. § 1677(7)(C) provides the basic guidelines the ITC must follow in evaluating whether subject imports have materially injured, threatened with material injury, or materially retarded the establishment of a U.S. industry.  Nothing in this or any other statute defines a minimum "size" or "amount" of domestic production.[9]  Nor do Plaintiffs' arguments persuade the court that an effective application of § 1677(7)(C) requires a specific level of domestic production.  While in some instances a dearth of production data may inhibit the ITC's analysis, in others a low level of domestic production may provide a discrete set of data that actually facilitates the Commission's investigation.  Where limited production does preclude an effective examination, however, the "product-line provision" of 19 U.S.C. § 1677(4)(D) (1994) allows the ITC to rectify this problem by examining "the production of the narrowest group or range of products, which includes a domestic like product, for which necessary information can be provided."  Of course, the ITC may also rely on non-data evidence, such as the testimony of current or potential producers, which can be highly probative on the question of causation.

---

clarifying the basis for agency action.  <u>See, e.g.</u>, <u>Atchison, Topeka & Santa Fe Railway Co. v. ICC</u>, 412 U.S. 800 (1973) (remanding agency action for clarification).

[9] <u>See</u> 19 U.S.C. § 1677(4)(A) (defining "industry" as simply "the producers as a whole of a domestic like product, or those producers whose collective output . . . constitutes a major proportion of the total domestic production of the product").

For these and other reasons,[10] the court rejects the idea that, as a general proposition, small or even minute production precludes a meaningful § 1677(7)(C) analysis.

It does not appear that limited domestic production precluded an effective § 1677(7)(C) analysis in this case. Here, the ITC had specific data on domestic production and prices (by means of average unit values) for cold-rolled plate, and was able to resort to product line data to assess the impact of imports on the domestic industry. While, as discussed below, the Commission erred in some of its data analysis, none of these errors were necessarily caused by the "small" level of domestic production. Moreover, for the <u>Final Determination</u> the ITC amassed substantial testimony concerning the domestic industry's interest in selling cold-rolled plate that was highly probative of the question of causation. <u>See</u> <u>infra</u>, Section III.C.4. The court therefore finds no reason to believe that the low level of domestic production at issue here precluded an effective § 1677(7)(C) analysis, and rejects Plaintiffs' claim accordingly.

---

[10] By precluding the ITC from finding the existence of a domestic industry when domestic production is non-existent or <u>de minimis</u>, Plaintiffs' argument would appear to prevent the ITC from determining whether "the establishment of an industry in the United States is materially retarded," as it is required to do under 19 U.S.C. § 1671d(b) (countervailing duties) and 19 U.S.C. § 1673d(b) (dumping). Presumably, where the establishment of a domestic industry has been materially retarded by subject imports, there will be little if any actual "production" by that industry.

**2**

### Substantial Record Evidence Supports the ITC's Finding That Cold-Rolled and Hot-Rolled Plate Constitute Separate Domestic Like Products.

Plaintiffs' other like product arguments challenge the evidence underlying the ITC's decision to treat cold-rolled and hot-rolled plate as separate like products.

The ITC's decision under 19 U.S.C. § 1677(10) as to what domestic product (or products) is "like" or "most similar in characteristics and uses" to the imported "subject merchandise" identified by Commerce is a factual determination, made on a case-by-case basis. NEC Corp. v. United States, 36 F. Supp.2d 380, 383 (CIT 1998). The ITC looks for clear dividing lines between possible like products, id., and avoids using minor differences in physical characteristics or uses to distinguish between products. See S. Rep. No. 96-249 at 90-91 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 476-77. To this end, the ITC generally considers six factors in distinguishing between products: (1) physical appearance, (2) interchangeability, (3) channels of distribution, (4) customer perceptions, (5) common manufacturing facilities and production employees, and (6) price. See, e.g., NEC Corp., 36 F. Supp. 2d at 383. No single factor is dispositive, and a clear dividing line between products may be found even when some of the six factors point to different conclusions. See, e.g., Torrington, 14 CIT at 656, 747 F. Supp. at 753 ("The finding of some similarities among the products delineated by the Commission is not sufficient to overturn the determinations when there is otherwise substantial evidence to support its findings.").

In this case, the ITC found that the majority of factors favored treating cold-rolled and hot-

rolled plate as distinct domestic like products, and that only one factor, channels of distribution, clearly pointed to an opposite conclusion. Final Determination at 6-7. The ITC found cold-rolled and hot-rolled plate to be separate like products and, accordingly, conducted separate injury determinations for the respective industries producing these products.

Plaintiffs challenge this determination on various grounds, each of which is summarized below. For the reasons that follow, the court upholds the ITC's like product determination as supported by substantial record evidence.

a

Neither the Specific Facts of this Investigation, Nor the ITC's Investigation in *Stainless Steel Bar*, Required the ITC to Conclude That the Differences in Physical Characteristics Between Cold-Rolled and Hot-Rolled Plate Were "Minor."

In the Final Determination, the ITC found that the chemical composition of cold-rolled plate is "generally similar to that of [hot-rolled] plate," insofar as "[b]oth are corrosion resistant and are available in similar dimensions." Id. at 6. The ITC also found, however, that cold-rolled plate "generally has a smoother finish with greater freedom from surface imperfections than [hot-rolled] plate, and can also be produced to tighter tolerances than the [hot-rolled] product." Id.

After comparing physical attributes, the ITC analyzed what effects the products' respective characteristics had on their "uses" and "interchangeability." The ITC found that while "[a]ll stainless steel plate is used "for tanks and equipment for industries for which the corrosion resistance, heat resistance, and/or ease of maintenance of stainless steel are needed," cold-rolled plate is used in certain

speciality applications "where a smooth surface that can be easily cleaned is essential." Id. As examples of such specialized applications, the ITC listed "containers and tanks for food processing, beer making, and dairies." Id. Turning to the question of interchangeability, the ITC also found "general agreement that cold-rolled plate in coils can be used for [hot-rolled] plate applications." Id. The Commission noted, however, that hot-rolled plate is "generally not interchangeable in applications calling for cold-rolled plate, at least without a further grinding/polishing process, and even then it would be substantially more expensive and may not meet required tolerances." Id.

As a result of these findings, the ITC concluded that "because cold-rolled plate differs somewhat from [hot-rolled] plate in surface finish and dimensional tolerances, resulting in limited interchangeability and different end uses . . . we find there to be a clear dividing line between [hot-rolled] plate and cold-rolled plate" Id. at 7.

Plaintiffs first argue that the only physical distinctions identified by the ITC were "that cold-rolled plate 'generally' has a smoother finish and 'can' be produced to tighter tolerances." Memorandum Of Law In Support Of Plaintiffs' Motion For Judgment Upon The Agency Record ("Plaintiffs' Memorandum") at 11. According to Plaintiffs, the ITC's decision to differentiate between hot and cold-rolled plate "based on these minor physical differences that may not even exist . . . are inconsistent with the Court's holdings that minor differences in physical characteristics are insufficient to find that different like products exist." Id. As support, Plaintiffs note that in a separate investigation, Stainless Steel Bar,[11] the ITC expressly rejected the idea that such differences could support a finding of

---

[11] Stainless Steel Bar from Brazil, India, Japan, and Spain, Inv. No. 731-TA-678, 679, 681, and 682 (Final), USITC Pub. 2856 (1995) ("Stainless Steel Bar").

separate like products.  Id. at 11-12.

Plaintiffs' arguments do not show the ITC's like product determination to be unsupported by substantial record evidence.  Whether physical differences between products are "minor" is a factual inquiry that varies from case to case.  NEC, 36 F. Supp.2d at 383.  Here, the ITC did not find that "smoother finish," "greater freedom from surface imperfections" and "tighter tolerances" per se distinguish cold-rolled from hot-rolled plate.  See Final Determination at 7 (characterizing cold-rolled plate as "differ[ing] somewhat from [hot-rolled] plate in surface finish and dimensional tolerances").  Rather, the Final Determination makes clear that the ITC found these physical characteristics significant because of their effect upon the uses and interchangeability of the two products.  In particular, the ITC found that physical differences between the products made hot-rolled plate "generally not interchangeable in applications calling for cold-rolled plate."  Final Determination at 6.

Because, as will be discussed below, the ITC's findings concerning the "uses" and "interchangeability" of the two products are themselves supported by substantial evidence, the ITC acted reasonably in not finding these physical distinctions to be "minor."  Simply put, a reasonable fact finder could view these physical differences as significant since, in the context of this investigation, these differences resulted in limited substitutability between hot-rolled and cold-rolled plate.  Plaintiffs have identified no evidence which leads the court to find otherwise.

In this regard, a useful contrast can be drawn to the investigation which Plaintiffs cite as supporting their position, Stainless Steel Bar.  In Stainless Steel Bar, the ITC found that hot-formed and cold-finished stainless steel bar constituted one like product (stainless steel bar) and not separate like

products. <u>Stainless Steel Bar</u> at § I. In reaching this conclusion, the ITC determined that differences in tolerance and finish between hot and cold-formed stainless steel bar were "important" and distinguished the two products based on a minimum industry standard. <u>Id.</u> The ITC, however, also found that

> The further processing involved in cold-finishing does not impart the primary characteristic of all [stainless steel bar], which is corrosion resistance, but rather simply makes the product suitable for its intended use. . . . If tolerance and finish specifications were the key factors in a like product analysis, as respondents argue, then we would arguably need to examine whether hundreds of like products exist since cold-finished [stainless steel bars] vary widely in tolerance and finish, as well as in steel chemistries, cross-sectional configurations, and diameter.

<u>Id.</u>

This conclusion is not inconsistent with the <u>Final Determination</u>. In <u>Stainless Steel Bar</u>, the ITC found that the different tolerance and finish given to stainless steel bar through the cold-finishing process did not impart the "primary characteristic" of stainless steel bar, corrosion resistance, but "simply [made] the product suitable for its intended use." <u>Id.</u> The ITC made this finding, however, in a factual circumstance much different than that in the <u>Final Determination</u>. In <u>Stainless Steel Bar</u>, the ITC effectively found that there were <u>not</u> distinct or different uses for hot-formed and cold-formed stainless steel bar, since 85 % of hot-formed bar was dedicated to the production of cold-finished bar, and much of the remaining 15 % was eventually cold-finished. <u>Id.</u> As the Commission noted, "[v]ery little [hot formed stainless steel bar] is used 'as is' by the purchaser." <u>Id.</u> In contrast, in the <u>Final Determination</u> the ITC found that similar physical differences in the tolerance and finish between hot and cold-rolled plate <u>did lead to different end uses and limited interchangeability</u>. <u>See</u> <u>Final Determination</u>

at 7.[12]


Because of these differences, the court finds no conflict between Stainless Steel Bar and the

Final Determination. Read together, these investigations simply indicate that whether physical

differences in finish and tolerances between hot and cold-processed stainless steel products are "minor"

varies from case to case, depending on, inter alia, the effect that such differences have on the uses and

interchangeability of the respective products. See NEC Corp., 36 F. Supp.2d at 384 ("[E]very like

product determination must be based on the particular record at issue and the unique facts of each

case."). The court therefore finds no basis to Plaintiffs' claim that Stainless Steel Bar is incompatible

with the Final Determination.

---

[12] These different conclusions reflect the different tests at issue in each investigation. In
Stainless Steel Bar, the ITC examined the "differences in the physical characteristics and functions of
the upstream and downstream articles" in the context of applying its finished/semifinished product
analysis. See Stainless Steel Bar at § I. The ITC employs this analysis, which examines such factors as
whether the upstream article (hot-formed stainless steel bar) is primarily dedicated to the production of
the downstream article (cold-formed stainless steel bar), in deciding whether there is a single like
product. Id. In contrast, in the Final Determination the ITC examined the physical characteristics and
uses of cold and hot-rolled plate in the context of its "traditional six-factor test" for determining whether
articles are separate domestic like products, as the Commission had already concluded that "such a
small proportion of domestic [hot-rolled] production is cold-rolled" that "it is not appropriate to treat
[hot-rolled] plate as a 'semifinished' product." Final Determination at 6 & n.20.

Thus, although the ITC confronted similar facts concerning physical characteristics in both
investigations, it did so in regard to two tests with distinctly different emphases.

b

<u>Record Evidence That the Tight Tolerances and Smooth Finish Associated with
Cold-Rolled Plate Could Be Achieved in Hot-Rolled Plate Through Additional Grinding
and Finishing Operations Does Not Undermine the ITC's Findings.</u>

As further support for its argument that the physical differences between cold and hot-rolled plate are minor, Plaintiffs note record evidence of the fact that the tight tolerances and smooth finish associated with cold-rolled plate could be achieved in the hot-rolled product through additional grinding and finishing operations.  Plaintiffs' Memorandum at 12.

While this evidence might, in isolation, support Plaintiffs' argument that the physical differences between cold and hot-rolled plate are minor, Plaintiffs' argument does not address the  ITC's decision to discount its significance in light of other record evidence showing (a) that even after further grinding and polishing, the hot-rolled plate may not meet required tolerances; and (b) that such additional processing would cause the hot-rolled product to be "substantially more expensive"  <u>Final Determination</u> at 6.  In their briefs, Plaintiffs identify no reason why this further evidence does not support, as it appears to, the reasonableness of the ITC's decision to distinguish between cold and hot-rolled plate.  Accordingly, because Plaintiffs have not shown that the record evidence, when viewed as a whole, could only reasonably have led to a conclusion that the physical differences between these products are "minor," there is no reason to disturb the Commission's findings.

c

<u>Plaintiffs' Arguments Concerning Other Factors in the ITC's</u>
<u>"Like Product" Determination Do Not Warrant a Remand.</u>

As a final argument against the ITC's like product determination, Plaintiffs identify various pieces of record evidence concerning the end uses, interchangeability, consumer perceptions and manufacturing operations of the two products which, it claims, "warrant[] the conclusion that cold-rolled plate is not a distinct domestic like product from [hot-rolled] plate."  Plaintiffs' Memorandum at 12-13.

While the evidence identified by Plaintiffs could merit a lengthy discussion for each factor analyzed by the Commission, such analysis is unnecessary.  Simply put, although Plaintiffs are correct to note that significant evidence illustrates the similarity between hot and cold-rolled plate, Plaintiffs' arguments do not address other record evidence identified by the ITC which reasonably distinguishes these products.  For example, to illustrate the similarities between the cold and hot-rolled plate, Plaintiffs note evidence that these products are generally sold for the same end uses in the food and chemical processing industry, as well as evidence that cold-rolled plate can be used for hot-rolled applications.  <u>Id.</u> at 13.  Plaintiffs' arguments do not address the fact, however, that in the <u>Final Determination</u> the ITC identified other record evidence which illustrates (a) that cold-rolled plate is used in "a limited number of specialized applications" where a smooth, easily cleanable surface is essential,[13] and (b) that hot-rolled plate is generally not interchangeable in applications calling for cold-rolled plate.  <u>Final Determination</u> at 6.  Plaintiffs identify no reasons why this other evidence does not reasonably support the ITC's finding that a clear dividing line can be found between cold and hot-rolled

_____

[13] As examples, the ITC noted "tanks for food processing, beer making, and dairies."  <u>Final Determination</u> at 6.

plate, notwithstanding other evidence of the products' similarities. Similarly, in discussing both customer perceptions and manufacturing operations, Plaintiffs do no more than identify record evidence which could arguably have led the ITC to a different conclusion.[14] Simply identifying such evidence, however, without more, does not undermine the Commission's findings. See Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) ("[Substantial evidence] is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); accord Grupo Industrial Camesa v. United States, 85 F.3d 1577, 1582 (Fed. Cir. 1996) (upholding ITC material injury determination).

Different considerations color the court's analysis of the last two factors challenged by Plaintiffs,

---

[14] Concerning manufacturing operations, Plaintiffs argue that the ITC "failed to note that [hot-rolled plate] may also be subject to certain cold-rolling operations," and cite in support their pre- and post-hearing briefs as evidence that [certain] producers reported using a cold-rolled operation in response to hot-rolled plate orders. Plaintiffs' Memorandum at 14-15. This evidence, however, does not show that this overlap in production methods was normal or typical. See, e.g., Petitioners' Posthearing Brief, Attachment 1 at 6 ("[One company] reported that it occasionally used cold-rolling as an alternative production route . . . . [A second company's] further examination . . . revealed that it too used the cold-rolling process to produce a product in response to orders for [hot-rolled] plate prior to 1997."). Moreover, Plaintiffs do not challenge the ITC's finding that cold-reduction takes place on a separate line with different employees, or its finding that the additional annealing and pickling operations performed on cold-rolled plate "is generally performed on a different line than annealing and pickling operations that occur after hot-rolling." Final Determination at 7.

As for customer perceptions, Plaintiffs claim simply that "where purchasers reported information in response to a survey not for hot- and cold-rolled plate separately, but for a single product called 'stainless steel plate', the Commission should have concluded that these perceptions further support a single like product finding." Plaintiffs' Memorandum at 14 (citation omitted). This claim, however, does not deal with the ITC's finding that domestic producers and importers "identified varying degrees of difference between [hot-rolled] and cold-rolled plate," or its finding that "customers specifically order cold-rolled product." Final Determination at 7.

channels of distribution and price, but the result is the same. With regard to channels of distribution, Plaintiffs correctly observe that the ITC's finding supports a single like-product determination. The ITC acknowledged as much in the <u>Final Determination</u>, stating that "[t]he record does not reflect any differentiation between the channels of distribution for [hot-rolled] and cold rolled stainless steel plate." <u>Final Determination</u> at 7. As noted previously, however, no single factor in a like product analysis is dispositive, and a clear dividing line between products may be found even when some of the six factors point to different conclusions. <u>Torrington</u>, 14 CIT at 656, 747 F. Supp. at 753. Thus, the fact that evidence concerning the products' channels of distribution supports a single like product determination does not render the Commission's findings to the contrary unsupported by substantial evidence.

Concerning the ITC's last finding, that cold-rolled plate commands a price premium over hot-rolled plate, Plaintiffs argue that the ITC improperly relied on evidence of average unit values. According to Plaintiffs, evidence concerning "average unit values of stainless coiled plate are meaningless because they do not differentiate between the various types of stainless plate products involved." Plaintiffs' Memorandum at 15.

As will be discussed subsequently, the Court of Appeals for the Federal Circuit has held that, because average unit values ("AUVs") may be influenced by changes in the mix of product sales, AUVs will not always provide a reasonable means for the ITC to estimate price changes in conducting its injury determination. <u>See</u> <u>U.S. Steel Group v. United States</u>, 96 F.3d 1352, 1364 (Fed. Cir. 1996) (holding that the ITC's ability to rely on AUVs as an indication of falling prices is subject to a rebuttable

presumption that the distribution of product sales remains constant).[15]  Whether such concerns

undermine the reasonableness of the ITC's use of AUVs in its like product determination, however,

does not affect the substantiality of the record evidence supporting the Commission's finding.  In the

<u>Final Determination</u>, the ITC, besides noting differences in AUVs, cited testimony from industry

representatives that cold-rolled plate sells at higher prices than hot-rolled plate because cold-rolling

adds $150 to $200 per ton to the production cost of stainless steel plate.  <u>See</u> Hearing Tr. at 113 and

120 (cited in <u>Final Determination</u> at 7 n.35).  This evidence itself appears to provide substantial

evidence that cold-rolled plate commands a price premium over hot-rolled plate, and Plaintiffs have

provided no arguments to indicate otherwise.  Thus, even if the ITC erred in relying on a comparison of

AUVs,[16] other evidence on prices identified in the <u>Final Determination</u> reasonably supports its

determination.  <u>Cf.</u> <u>U.S. Steel</u>, 96 F.3d at 1364-65 (finding that, even though two commissioners

improperly relied on declining AUV figures, other evidence sufficiently supported their threat of material

injury determination).


In short, Plaintiffs have not provided a basis for disturbing the ITC's finding that two like

products, hot and cold-rolled plate, correspond to the subject merchandise identified by Commerce.

Although Plaintiffs have identified a significant amount of record evidence which illustrates the similarities

between these products, and could arguably have supported a single like product determination,

substantial evidence also supports the ITC's finding that a clear dividing line can be drawn between

---

[15] AUVs are computed by multiplying the price of a product by the quantity sold, summing these results, and then dividing the sum total by the total number of products sold.  <u>U.S. Steel</u>, 96 F.3d at 1364.

[16] For purposes of this analysis, the court assumes, without deciding, that the ITC erred in relying on AUVs for making its prices comparison.

them.  Given this opposing evidence, the court does not find that the Commission abused its discretion, or otherwise erred, in evaluating the record before it.  See NEC Corp., 36 F. Supp.2d at 384 ("[T]he Commission has broad discretion in determining whether a particular difference or similarity is minor.").  The ITC's finding that cold and hot-rolled plate are separate like products is therefore affirmed.

**C**

**DESPITE ERRORS IN ITS SUBSIDIARY DETERMINATIONS, THE COURT AFFIRMS THE COMMISSION'S FINDING OF NO MATERIAL INJURY.**

To make an affirmative injury determination, the ITC must find that "an industry in the United States . . . is materially injured . . .  by reason of [the subject] imports."  19 U.S.C. § 1673d(b)(1) (antidumping); 19 U.S.C. § 1671d(b)(1) (countervailing duties).  "Material injury" is defined as "harm which is not inconsequential, immaterial, or unimportant."  19 U.S.C. § 1677(7)(A).  In order to show that material injury was "by reason of" subject imports, the ITC must find a "causal -- not merely temporal -- connection between the [subject imports] and the material injury."  Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997).  "[E]vidence of de minimis (e.g., minimal or tangential) causation of injury does not reach the causation level required under the statute."  Id. at 722.

The guidelines established by Congress for analyzing the causal nexus between the subject imports and the potential material injury mandate consideration of at least three factors: (1) the volume of imports, (2) the effect of imports of that merchandise on prices in the United States for like products, and (3) the impact of such merchandise on domestic producers of like products.  19 U.S.C. § 1677(7)(B)(i).  Pursuant to 19 U.S.C. § 1677(7)(B)(ii), the Commission may also "consider such other

economic factors as are relevant to the determination." No single factor is determinative, and the ITC

evaluates all relevant economic factors "within the context of the business cycle and conditions of

competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). In evaluating the

evidence, the "commissioners are free to attach different weight to the various statutory tests which they

are required to employ when evaluating the presence or threat of injury." U.S. Steel, 96 F.3d at 1362.

In the Final Determination, the ITC found that the domestic industry producing cold-rolled plate

was not materially injured by reason of subject imports of cold-rolled plate, despite the fact that such

imports increased significantly, enjoyed a "dominant market share," and had declining AUVs over the

period of investigation. Final Determination at 23-24. Essentially, the ITC found that the domestic

industry had not been injured by this increase in imports because (a) domestic producers did not

experience lost sales or incur adverse price effects due to the cold-rolled imports; (b) the small

magnitude of the subject imports were too small to have contributed to the declining health of the

domestic industry producing stainless steel plate in coils; and (c) the domestic industry did not consider

cold-rolled plate an important part of its business. See id. at 23-25.

Plaintiffs advance multiple arguments why the ITC's injury investigation is unsupported by

substantial record evidence or otherwise not in accordance with law. For the reasons stated below, the

court affirms the ITC's negative injury determination.

## The Commission's "Volume" Analysis Was in Accordance With Law And Supported by Substantial Evidence.

a

### The Commission Did Not Err in Relying on Alternative Table C-3.

19 U.S.C. § 1677(7)(C)(i) directs the ITC, in evaluating whether subject imports have caused material injury to a domestic industry, to "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."

In the Final Determination, the ITC found the cumulated volume of subject cold-rolled plate imports to be "significant," since subject imports had risen substantially from 1995 to 1998 and controlled a dominant share of the U.S. cold-rolled plate market. Final Determination at 23 & n.143 (citing "Alternative Table C-3"). Despite this finding, however, the ITC did not find the volume of cold-rolled imports to be a cause of material injury to the domestic industry. The ITC found the domestic industry's production of cold-rolled plate over the period of investigation to be "very limited," never reaching more than a small percentage of U.S. market share. Id. The Commission also identified record evidence that "the industry itself has characterized cold-rolled plate as a tiny and unimportant part of its business," and noted that "there is no indication that the domestic producers lost market share to subject imports." Id.; Plaintiffs' Reply at 10.

Plaintiffs first challenge these findings by arguing that the ITC improperly based its analysis of

the market share held by subject imports and the U.S. industry on a document, Alternative Table C-3, that was not part of the record and never provided to their counsel. According to Plaintiffs, although Alternative Table C-3 was cited in footnote 143 of the Final Determination, no such document exists in the record filed with the court, nor was this document provided to Plaintiffs when the ITC released its proprietary data under administrative protective order. Plaintiffs' Memorandum at 16-17. Thus, Plaintiffs argue, by relying on Alternative Table C-3, the ITC both (a) relied on non-record evidence, and (b) caused it substantial prejudice by relying on a document upon which it was not allowed to comment.

As to the question of whether Alternative Table C-3 is part of the record, the answer is clear. In relevant part, 19 U.S.C. § 1516a(b)(2)(A) (1994) provides that the record consists of "all information presented to or obtained by the . . . Commission during the course of the administrative proceeding, including all governmental memoranda pertaining to the case and the record of ex parte meetings required to be kept by section 1677f(a)(3) of this title."[17] See also Beker Indus. Corp. v. United States, 7 CIT 313, 315 (1984) ("The scope of the record for purposes of judicial review is based upon information which was 'before the relevant decision-maker' and was presented and considered 'at the time the decision was rendered.'") (quoting S.Rep. No. 96-249 at 247-48 (1979), reprinted in 1979 U.S.C.C.A.N. at 633). Under this broad definition, Alternative Table C-3 is part of the record. Alternative Table C-3 was prepared by the Commission's staff shortly before the commissioners' vote on April 22, 1999, and, as evidenced by footnote 143 of the Final Determination, was relied on by the plurality of commissioners in support of their findings. Based on these facts, which

_____

[17] USCIT R. 71(a)(1) tracks the language of § 1516a(b)(2)(A) and requires filing of these documents with the Clerk of the Court.

are undisputed, Alternative Table C-3 clearly constitutes "information presented to or obtained by the . . . Commission during the course of the administrative proceeding."[18] 19 U.S.C. § 1516a(b)(2)(A).

Did, however, the ITC's reliance on this document deprive Plaintiffs of due process? In their Reply, Plaintiffs argue that the last minute creation of Alternative Table C-3 ignored 19 C.F.R. § 207.22 (1999), which required the ITC to provide the parties with copies of its prehearing and final staff reports. According to Plaintiffs, these reports "contain the relevant record evidence on which the Commission intends to rely," and are "relied upon by the parties to meaningfully frame issues to the Commission." Plaintiffs' Reply at 10. Thus, Plaintiffs assert, by representing the data in one way to the parties in Table C-3, and relying on Alternative Table C-3 for the Final Determination, the ITC "affirmatively misled and deprived the parties of the meaningful participation in the investigation contemplated by the Commission's regulations." Id.

19 C.F.R. § 207.22 (1999), entitled "[p]rehearing and final staff reports," provides:

(a) Prehearing staff report. The Director shall prepare and place in the record, prior to the hearing, a prehearing staff report containing information concerning the subject matter of the investigation. A version of the staff report containing business proprietary information shall be placed in the nonpublic record and made available to persons authorized to receive business proprietary information under § 207.7, and a nonbusiness proprietary version of the staff report shall be placed in the public record.

---

[18] In their Reply, Plaintiffs argue that Alternative Table C-3 "was created at the eleventh hour (after the record had closed)." Plaintiffs' Reply at 10. Plaintiffs, however, present no argument why the "record had closed" before the commissioners had voted on this investigation, nor do they present any reason why a document that was "presented to . . . the Commission during the course of the administrative proceeding" should be excluded from the record simply because of the lateness of its presentation.

(b) Final staff report.  After the hearing, the Director shall revise the prehearing staff report and submit to the Commission, prior to the Commission's final determination, a final version of the staff report.  The final staff report is intended to supplement and correct the information contained in the prehearing staff report.  A public version of the final staff report shall be made available to the public and a business proprietary version shall also be made available to persons authorized to receive business proprietary information under section 207.7.

It is a general rule that an agency must comply with its own regulations.  Oy v. United States, 61 F.3d 866, 871 (Fed. Cir. 1995); see also Gulf State Tube Division of Quanex Corp. v. United States, 21 CIT 1013, 1039, 981 F. Supp. 630, 652 (1997) (recognizing that, since there is no Constitutional right to engage in trade, parties' due process rights in antidumping investigations are those set out in statute or in implementing regulations).  Nothing in the facts at bar, however, indicate that the ITC violated 19 C.F.R. § 207.22 by creating Alternative Table C-3.  This regulation obligates the ITC to produce and provide the public with a public version (and, when appropriate, a confidential version) of the prehearing and final staff reports.  Nothing in this regulation, however, states that all information relied upon by the commissioners must be in the staff report,[19] or that parties have a right to comment upon every document developed by the Commission's staff prior to the final determination.  In fact, the history of this provision makes clear that this regulation does not even entitle parties to see final staff

---

[19] The Commission's own definition of what constitutes the "record" indicates that there can exist "governmental memoranda" that are not part of the "staff report."  See 19 C.F.R. § 207.2(f)(1) (1999) (defining the "record" as, inter alia, "staff reports, all governmental memoranda pertaining to the case, and the record of ex parte meetings").  See also Wells Mfg. Co. v. United States, 11 CIT 911, 921, 677 F. Supp. 1239, 1247 (1987) ("[T]he ITC may, and indeed must, consider all evidence presented which comprises the record, whether or not incorporated in the staff report.");  accord Calabrian Corp. v. U.S. International Trade Comm'n, 16 CIT 342, 351, 794 F. Supp. 377, 386 (1992) (citing Wells).

reports before issuance of final determinations.[20]  Thus, because Plaintiffs have not alleged that the Commission somehow erred in creating the final staff report or making it available to the public, the court does not find any violation of § 207.22.

Even assuming that the ITC violated § 207.22, however, Plaintiffs have not shown any "prejudice" that could be cured by a remand.  Since Plaintiffs essentially allege that the ITC committed a procedural error in relying on a document which, though part of the record, was not included in the final staff report, to obtain relief Plaintiffs must show that they were substantially prejudiced by this error. See American Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 539 (1970) ("'[I]t is always within the discretion of . . . an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it.  The action of [an agency] in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party.'") (quoting NLRB v. Monsanto Chemical Co., 205 F.2d 763, 764 (8th Cir. 1953)); United States v. Caceres, 440 U.S. 741 (1979) (failure of IRS agent to follow IRS electronic

---

[20] This provision formerly provided that "[a] public version of the final staff report shall be made available to the public after the Commission's final determination."  19 C.F.R. § 207.21 (1994). Although this regulation was subsequently amended to delete the language concerning submission of the final staff report "after the Commission's final determination," the history of this amendment shows that it was not meant to provide parties with a right to review or comment upon the staff report prior to issuance of the final determination.  See Notice of Interim Amendment to Rules of Practice and Procedure, 60 Fed. Reg. 18, 20 (ITC Jan. 3, 1995) ("In furtherance of new section 207.29 [now 19 C.F.R. § 207.30 (2000)], the Commission may adopt a practice of releasing staff reports on or before the disclosure date established pursuant to that section in the event that one or more parties to an investigation or review do not have access to business proprietary information subject to administrative protective order.  Section 207.21(b) is therefore amended to delete the clause stating that the public version of the Commission's final staff report will be released 'after the Commission's final determination.'  The Commission does not take the position, however, that such a practice is required by section 207.29.  Nor does the Commission anticipate that it will necessarily release public copies of staff reports on or before the disclosure date as a general matter.").

recording regulation before recording conversation between taxpayer and agent did not require suppression of tape recordings in prosecution of taxpayer); <u>Oy</u>, 61 F.3d at 875 ("Since the requirement at issue is merely procedural, Kemira must establish that it was prejudiced by Commerce's non-compliance with this requirement."); <u>Belton Indus., Inc. v. United States</u>, 6 F.3d 756, 761 (Fed. Cir. 1993) (requiring showing of prejudice from Commerce's non-compliance with countervailing duty sunset provision).

In its Response, Defendant notes that the original Table C-3 "inadvertently omitted questionnaire data collected on nonsubject imports," thus "misstat[ing] the market shares of both the subject imports and the domestic like product."  Defendant [ITC's] Memorandum In Opposition To Plaintiffs' Motion For Judgment On The Agency Record ("Defendant's Response") at 19.  Defendant also observes that the information used to derive Alternative Table C-3 came from two importer questionnaire responses that had previously been made available to Plaintiffs' attorneys and economists. <u>Id.</u> at 20.  Plaintiffs neither challenge these observations, nor argue that Alternative Table C-3 manipulated the record evidence in an unreliable way.  In fact, Plaintiffs present no substantive claim that reliance on Alternative Table C-3 was prejudicial; they merely say they were "denied the ability to address the record facts as viewed by the Commission, " without saying what that comment would be. Plaintiffs' Reply at 10.

Without more, the court is left to conclude that Alternative Table C-3 is simply the Commission's attempt to repair incorrect record evidence (the original Table C-3) using other record evidence that had already been provided to the parties.  Such action cannot reasonably be said to

"prejudice" [21] Plaintiffs.[22]  Cf. Wells, 11 CIT at 921, 677 F. Supp. at 1247 ("[T]he staff is not required

to present the data in the light most favorable to plaintiff.  The staff is concerned solely with presenting a

complete and accurate picture of the state of the domestic industry for a particular product or

products.").  In fact, and as Defendant correctly notes, had the ITC not revised Table C-3, Plaintiffs

might have been able to seek a remand "on the grounds that the Commission's determination was

premised on erroneous facts."  Defendant's Response at 20 n.22.

In short, Alternative Table C-3 is properly part of the record of this case, and the ITC's

reliance on this document did not deprive Plaintiffs of due process.  The ITC's use of Alternative Table

C-3 was therefore neither in violation of law nor unsupported by substantial record evidence.

b

Plaintiffs' Argument That the ITC's "Volume" Analysis Confused Hot and Cold-Rolled Plate Production
is Best Evaluated as Part of the Court's "Impact" and "Causation" Analyses Below.

Plaintiffs next argue that the ITC, after deciding that cold-rolled plate is a separate like product,

---

[21] Prejudice, for purposes of determining whether an error committed by the Customs Service was "harmless," has been defined as "injury to an interest that the statute, regulation, or rule in question was designed to protect." Intercargo Ins. Co. v. United States, 83 F.3d 391, 396 (Fed. Cir. 1996).

[22] Particularly since, in the Final Determination, the ITC cited the figures contained in Alternative Table C-3 as support for its finding that the rising volume and market share of subject imports was "significant." Final Determination at 23.  This finding supports Plaintiffs' position, and Plaintiffs have not argued  (and it is not obvious) that further consideration of Table C-3 could undermine the Commission's stated reasons for discounting this finding (namely, the fact that the domestic industry's production is "very limited," the fact that the industry has characterized its sales as "tiny and unimportant," and the fact that "there is no indication that the domestic producers lost market share to subject imports," id.).

improperly examined the volume of cold-rolled imports in relation to all domestic production of stainless steel plate. See Plaintiffs' Memorandum at 17-19. According to Plaintiffs, the ITC's statement that "the domestic industry's production of cold-rolled plate is very limited and that the industry itself has characterized cold-rolled plate as a tiny and unimportant part of its business,"[29] Final Determination at 23, is inconsistent with its statutory mandate to analyze the volume of subject merchandise and the impact of those imports on the domestic industry identified (here, the cold-rolled plate industry). Id. at 18 (citing 19 U.S.C. § 1677(4)(A)). As support, Plaintiffs cite Alberta Pork Producers' Mktg. Bd. v. United States, 11 CIT 563, 669 F. Supp. 445 (1987), which held that it was inappropriate to combine data for two separate products and industries to analyze injury to one industry alone. Plaintiffs' Memorandum at 18.

In essence, Plaintiffs argue that the ITC improperly examined the effect of the subject imports in regard to the entire stainless steel plate industry, instead of just the industry producing cold-rolled plate. There is little substantive distinction, however, between this argument and Plaintiffs' argument that the ITC failed to properly analyze the impact of subject imports on the domestic cold-rolled plate industry.[31] See id. at 26-29. Although addressed to different sections of the Final Determination, both

---

[29] Commissioner Crawford did not join in this statement, but rather joined in only the factual, numerical discussion of the volume of imports in this section. See Final Determination at 23 n.144 ("[Commissioner Crawford] does not rely on any analysis of trends in the market share of subject imports or other factors in her determination of material injury . . . . She makes her finding of the significance of volume in the context of the price effects and impact of the subject imports.").

[31] For example, Section III.A. of Plaintiffs Reply, which challenges the ITC's volume analysis, quotes the same statement as that quoted in Section II.C. of Plaintiffs' Memorandum (challenging the ITC's "impact" analysis) and Section III.C. of its Reply (challenging the ITC's application of the "product line" provision). Compare Plaintiffs' Reply at 11 with Plaintiffs' Reply at 14 and Plaintiffs' Memorandum at 27. Specifically, all three sections quote the statement that

arguments attack the rationale[32] used by the ITC for determining that the "significant" volume of subject imports did not adversely impact the domestic industry. Moreover, as Plaintiffs' argument also attacks the ITC's finding that cold-rolled plate production is an unimportant part of the domestic industry's business, this claim is directly relevant to the question, discussed below, of whether such "lack of interest" is a sufficient basis for finding no material injury. Accordingly, because Plaintiffs' argument is closely related to these other questions, the court finds it appropriate to evaluate this argument as part of its "impact" and "causation" analyses in Sections III.C.3 and II.C.4 below.

**2**

**The Commission's "Price" Analysis Is Unsupported by Substantial Evidence.**

In determining whether a domestic industry has been injured by reason of subject imports, 19 U.S.C. § 1677(7)(B) directs the ITC to examine, inter alia, "the effect of imports of that merchandise on prices in the United States for domestic like products." 19 U.S.C. § 1677(7)(C)(ii) elaborates on

---

> Due to the extremely small magnitude of subject imports of cold-rolled plate relative to domestic production of all certain stainless steel plate in coils, we do not find that cumulated subject imports of cold-rolled plate, despite their large share of the cold-rolled market and declining average unit values, are having an adverse impact on the domestic industry.

Final Determination at 25 (emphasis added).

[32] Although phrased in slightly different terms, the ITC expressed essentially the same findings concerning "causation" in both the "volume" and "impact" sections of its analysis. Compare Final Determination at 23 (citing Hearing Tr. at 50-51 and 114, and Ex. 5 of Petitioners' Post Hearing Brief for the proposition that "the industry itself has characterized cold-rolled plate as a tiny and unimportant part of its business") with Final Determination at 24 (citing the same evidence for the statement that "none of these domestic producers actively markets or promotes [cold-rolled plate]"). See also Final Determination at 25 (referring to its earlier "volume" analysis and noting that "[a]s discussed above, domestic cold-rolled production remained stable, albeit at a very low level . . . .").

this requirement, stating that

> In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether--
>     (I) there has been <u>significant price underselling</u> by the imported merchandise as compared with the price of domestic like products of the United States, and
>     (II) the effect of imports of such merchandise <u>otherwise depresses prices to a significant degree or prevents price increases</u>, which otherwise would have occurred, to a significant degree. (emphasis added).

In the <u>Final Determination</u>, the ITC stated that although it "did not collect price comparison data on any cold-rolled plate products," it had data on the AUVs of both domestic and subject import sales of cold-rolled plate. <u>Final Determination</u> at 23. Examining this data, which reflects the average price per ton for cold-rolled plate, the Commission found that "[t]he average unit value of cumulated subject imports declined steadily over the period of investigation, beginning at a higher level than that for the domestic like product and falling below in 1997 and interim 1998." <u>Id.</u> at 23-24. The ITC also noted that "[t]he average unit value of domestic shipments declined irregularly between 1995 and 1997 and was lower in interim 1998 than in interim 1997." <u>Id.</u> at 23. Notwithstanding this evidence, however, the ITC found no clear connection between the domestic price declines and the subject imports, since (a) "during much of the period, the domestic price decreased even though subject imports were priced substantially higher"; and (b) "petitioners did not allege that domestic producers of cold-rolled plate experienced any lost sales or incurred any adverse price effects due to the cold-rolled subject imports." <u>Id.</u> at 24.[33]

---

[33] Commissioner Crawford concurred in finding that subject imports were not having significant effects on domestic prices, although she did so by comparing the domestic prices that existed when the imports were traded unfairly with what domestic prices would have been had the imports been traded fairly. <u>See</u> <u>Final Determination</u> at 24 n.150 and 18 n.108. Plaintiffs do not challenge Commissioner Crawford's analysis.

Plaintiffs advance three arguments for why this determination is unsupported by substantial evidence, each of which is discussed below.

a

The ITC Did Not Commit Legal Error by Failing to Collect or Use Specific Price Information.

Plaintiffs first argue that the ITC's analysis is in error, both legally and factually,[34] because the ITC failed to gather specific price comparison data for domestic and subject foreign cold-rolled plate sales. According to Plaintiffs, "[t]he Commission's failure to collect and analyze pricing information alone, given the statutory mandate [of 19 U.S.C. § 1677(7)(C)(ii)] that the Commission examine the effect of import prices on the U.S. industry, renders the Commission's final decision unsupported by substantial record evidence of record and not in accordance with law." Plaintiffs' Memorandum at 20. As support, Plaintiffs cite Roquette Freres v. United States, which stated that "[i]t is incumbent on the ITC to acquire all obtainable or accessible information from the affected industries on the economic factors necessary for its analysis." Id. (quoting Roquette Freres, 7 CIT 88, 94, 583 F. Supp. 599, 604 (1984)).

As noted above, 19 U.S.C. § 1677(7)(C)(ii) provides that

---

[34] Although the heading used in Plaintiffs' Memorandum states only that they are challenging the ITC's price findings on substantial evidence grounds, see Plaintiffs' Memorandum at 19 (stating, as Heading B.1., that "**The Commission's Failure to Request Pricing Data on Cold-Rolled Plate Renders Its Pricing Analysis Unsupported by Substantial Evidence of Record**"), the substance of their briefs reveals both legal and factual arguments. See, e.g., id. at 20 ("The Commission's failure to collect and analyze pricing information alone, given the statutory mandate . . . renders the Commission's final decision unsupported by substantial evidence of record and not in accordance with law."). Accordingly, the court evaluates both the legal and factual aspects of Plaintiffs' claim.

　　　In evaluating the effect of imports of such merchandise on prices, the Commission
shall consider whether--
　　　(I) there has been significant price underselling by the imported merchandise as
compared with the price of domestic like products of the United States, and
　　　(II) the effect of imports of such merchandise otherwise depresses prices to a
significant degree or prevents price increases, which otherwise would have occurred, to
a significant degree. (emphasis added).


　　　Nothing in this statute states that the ITC must collect or use price comparison data in its

analysis.  While such data would presumably be collected by the ITC in the normal course, the statute

does not require such evidence.  Rather, the statute is simply silent as to what evidence the ITC must

consider in determining whether there has been "significant price underselling by the imported

merchandise as compared with the price of domestic like products," and whether "imports of such

merchandise otherwise depresses prices to a significant degree or prevents price increases."  Given this

silence, the court does not find that the ITC committed legal error by failing to collect or use specific

price information.[35]  See Czestochowa v. United States, 19 CIT 758, 785, 890 F.Supp. 1053, 1075

(1995) ("[T]he statute does not require that the Commission assess the price-depressing effects of

imports in any particular manner."); Iwatsu Electric Co., Ltd. v. United States, 15 CIT 44, 54, 758 F.

Supp. 1506, 1515 (1991) ("Difficulties with, or even impossibility of, direct price comparison do not

mandate a negative determination.").


　　　Similarly, the court does not find that the ITC's failure to collect or rely upon specific price data

_____

　　　[35] The court finds no need to reach Defendant's claim that the ITC's use of non-price
comparison data was justified as a use of facts otherwise available under 19 U.S.C. § 1677e(a)
(1994).  See U.S. Steel, 96 F.3d at 1365-66 ("We need not decide [the issue of 'whose fault it is that
the Commission collected the allegedly unrepresentative data'] because Hoogovens has failed to make
a threshold showing that the sample data relied on by the Commission was, in fact, not
representative.").

per se renders its conclusions unsupported.  Whether the ITC's findings on the subsidiary issue of price

effects is supported by substantial evidence depends on whether, in light of the record evidence as a

whole, "a reasonable fact finder could have arrived at the agency's decision."  In re Gartside, 203 F.3d

1305, 1312 (Fed. Cir. 2000).  Here, the ITC cited evidence of the AUVs for domestic and (subject)

imported cold-rolled plate, as well as evidence that "petitioners did not allege that domestic producers

of cold-rolled plate experienced any lost sales or incurred any adverse price effects due to the cold-

rolled subject imports," as support for its findings.  Final Determination at 24.  Without reaching the

specifics of this evidence, which are addressed below, the court finds no reason why the ITC's reliance

on such evidence alone would be unreasonable per se.  Both AUVs and the domestic industry's own

statements concerning its economic condition are important evidence of whether a domestic industry

has been, or risks being, injured by subject imports.  See U.S. Steel, 96 F.3d at 1364, 1366-67

(holding that AUVs constitute a reasonable means of measuring pricing trends, absent a showing that

declining AUVs are caused by factors besides falling prices); Suramerica de Aleaciones Laminadas,

C.A. v. United States, 44 F.3d 978, 984 (Fed. Cir. 1994) ("The industry best knows its own economic

interests . . . .  Indeed an industry's failure to acknowledge an affirmative threat has direct

significance.").  In fact, in U.S. Steel the Federal Circuit explicitly held that trends in AUVs can be a

reasonable means of measuring changes in prices in most instances.  See U.S. Steel at 1364 ("[W]e do

not hold, as a general rule, that the Commission may not rely on AUV trends as indicative of

corresponding changes in price.").  There is therefore no basis for requiring the ITC to collect and

consider other evidence,[36] assuming the record evidence already identified reasonably supports its

---

[36] This is not to say that, had price comparison data been collected by the ITC or put on the record by the parties, the ITC could have ignored such evidence.  The substantial evidence standard requires the ITC to consider whether "the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the

conclusion.[37]  It is to this inquiry that the court now turns.


b


### The Commission's Use of Average Unit Values to Make Specific Price Comparisons Is Unsupported by Substantial Evidence.


Plaintiffs' next challenge the Commission's use of AUVs in its price determination.  According to Plaintiffs, record evidence shows that "[p]rices of stainless steel plate products vary significantly depending on the grade, dimensions and finishes of the plate involved."  Plaintiffs' Memorandum at 22.  Such evidence, Plaintiffs argue, "coupled with evidence submitted by the Belgian producer that the type of cold-rolled plate that it manufactured was different from that made by the U.S. mills," establishes that the imported and domestic cold-rolled plate were not the same products -- a fact which "rebut[s] any

_____

[agency's] view."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); accord Gerald Metals, 132 F.3d at 720 (ITC determination).  Rather, the court simply holds that the absence of such evidence does not per se render the ITC's findings on this subsidiary issue unsupported by substantial evidence.

[37] This finding is not incompatible with idea that the "[i]t is incumbent on the ITC to acquire all obtainable or accessible information from the affected industries on the economic factors necessary for its analysis."  Roquette Freres, 7 CIT at 94, 583 F. Supp. at 604.  While this statement sets forth the standard that must generally guide the Commission in making its injury determinations, particularly when it purports to rely on facts otherwise available, see 19 U.S.C. § 1677m(d) (1994), the court does not read this statement as requiring a level of diligence beyond that required by statute or the substantial evidence test.  See Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1561 (Fed. Cir. 1994) ("While it may be true that the ITC staff might have been more aggressive in pursuing plant-by-plant data . . . , we are not here reviewing the ITC's diligence. . . .  Rather, Atlantic Sugar's concerns go to the question of the evidence on the record for the injury determination, as discussed below.  If that evidence is insubstantial, then the reviewing court must either reverse the ITC's determination or remand the case for further fact-finding."); Kenda Rubber Indus. Co., Ltd. v. United States, 10 CIT 120, 124-26, 630 F. Supp. 354, 357-58 (1986) (finding, in regard to a claim that the ITC improperly found injury to the separate tire and tube industries on the basis of aggregated data, that "[a]lthough ideally an investigation would include such [segregated] data," there was sufficient record evidence "from which a reasonable mind might draw the conclusion that the Commission drew.").

presumption that AUVs could be used as a proxy for price." Id. at 22-23.

In U.S. Steel, the Federal Circuit evaluated a similar claim, addressing whether the cold-rolled

steel industry comprised so many different products as to make it impossible for trends in AUVs to

accurately reflect pricing trends. See U.S. Steel, 96 F.3d at 1366. In resolving this question, the court

stated:

> [T]he burden here is on Hoogovens to show, by hard evidence, that in this case falling
> AUVs are not representative of falling prices, but rather are due to some other factor,
> such as a redistribution in domestic consumption. Hoogovens general allegations that
> the breadth of products encompassed within the cold-rolled universe precludes reliance
> on AUVs are not sufficient to meet this burden. We therefore decline to reverse
> Commissioner Newquist's determination on this ground.

Id. at 1366-67.

This explanation is equally applicable here, insofar as the ITC relied on AUVs as evidence of

general price trends. Plaintiffs present no evidence that the declining prices identified by the ITC were

caused by shifts in demand from expensive to inexpensive products, or some other non-price factor, as

opposed to general changes in prices for domestic and subject cold-rolled plate imports. See id. at

1364 (noting that "the Commission's implicit 'constant product distribution' presumption is wholly

appropriate in most instances."). Rather, Plaintiffs essentially argue that the ITC failed to compare

"apples to apples" because it did not ensure that such factors as the grade, finish, and dimensions of the

imported and domestic cold-rolled plate sales were the same before comparing AUVs. While ensuring

similarity among such factors would certainly have allowed for more precise, product-specific

comparisons, U.S. Steel makes clear that the averaging of prices implicit in the calculation of AUVs

does not render AUV comparisons unreliable as an indication of general price trends. See id. at 1364

("[W]e do not hold, as a general rule, that the Commission may not rely on AUV trends as indicative of corresponding changes in price."). Thus, it was not error for the ITC to use this data as evidence of <u>general</u> price trends.

However, substantial evidence does not support the ITC's use of this data as specific evidence of price underselling. <u>U.S. Steel</u> established that AUVs may be a reliable indicators of general price trends, provided the "product mix" comprising an AUV does not significantly change over time. Here, the ITC went beyond using AUVs as general indicators of price trends, and essentially used the AUVs for specific price comparison purposes. See <u>Final Determination</u> at 23-24 and n.149 (finding that the AUV for cumulated subject imports "[began] at a higher level than that for the domestic like product" and then "[fell] below in 1997 and interim 1998" ). The Commission then based its finding in part on this comparison, stating that "[t]here is no clear connection . . . since, <u>during much of the period</u>, the domestic price decreased even though the <u>subject imports were priced substantially higher</u>." <u>Id.</u> at 24 (emphasis added). That, the Commission could not do.

The AUVs used by the ITC simply reflected per short ton average prices and, as such, would only have been reliable for direct comparison purposes if the product mix between expensive and inexpensive products (based on such price factors as size, grade, or finish) was similar for both domestic and subject import sales.[38] The limited record evidence concerning cold-rolled prices,

---

[38] See <u>U.S. Steel</u>, 96 F.3d at 1363-64 ("Average values speak only to the attributes of the composite figures in the aggregate. They say nothing about the composite figures individually."). To specifically demonstrate price underselling, or to make a stronger showing of price suppression, the ITC would need to rely on evidence besides AUVs. <u>Cf.</u> <u>Iwatsu Electric</u>, 15 CIT at 55, 758 F. Supp. at 1515 (noting testimony from an importer "that prices had been driven down," as well as "several published reports by independent industry analysts indicating that prices declined during the period," as

however, shows that this was not the case, since the principle Belgian producer of cold-rolled plate

exported a wider, more expensive, product than that produced domestically.  See Posthearing Brief of

ALZ, N.V. and Trefilarbed Inc. of 03/29/99 at 6-7 ("The U.S. mills were offering lower prices for their

narrower products than ALZ was for its wider product.").[39]  Moreover, the small amount of domestic

production during the period examined also indicates that AUVs for domestic production were strongly

influenced by the particular grade or size characteristics of only a few orders, and did not reflect a

broad average.  See Petitioners' Posthearing Brief of 03/29/99 at 6-7 (noting, inter alia, that Allegheny

produced only [confidential amount] of cold-rolled plate in 1997 in response to two orders, and that

J&L produced only [confidential amount] in 1997 and [confidential amount] in interim 1998).

Thus, because the product mixes of the domestic and foreign merchandise differed, the fact that

for much of the period reviewed the AUVs for subject imports were higher than those for domestic

cold-rolled plate, without more, says little about whether there was significant price competition

between similarly situated cold-rolled products.  It was therefore error for the ITC to have relied on

comparisons of AUV data as evidence that subject cold-rolled imports were not causing adverse price

effects.

---

additional data supporting the ITC's price depression finding).

[39] See also Views of the [ITC], Rec. Doc. 266, at 19 (noting that [a significant portion] of the Belgian producer ALZ's exports to the United States in 1997 were greater in width than the cold-rolled product made domestically).

c

### The Commission's Finding That Subject Imports Had No Adverse Price Effects Is Unsupported by Substantial Evidence.

Plaintiffs last challenge the ITC's price determination by arguing that the ultimate conclusion it drew from the AUV evidence, that subject imports did not adversely affect domestic cold-rolled plate prices, is unsupported by the record. See Plaintiffs' Memorandum at 23. According to Plaintiffs, "[i]t is difficult to imagine how the Commission can conclude that there is no evidence of price depression when the prices of both the imported and domestic products declined significantly, or to determine that imports were not the cause of that price depression when the subject imports were priced lower than the U.S. product for the most recent periods in which the price declines were observed." Id. at 24. Plaintiffs also argue that the ITC's conclusion is inconsistent with its findings, based on similar data, concerning hot-rolled plate in the same investigation. See id. at 25-26.

In the Final Determination the ITC did "not find that subject imports depressed or suppressed the prices of the domestic like product," nor did it "find significant underselling by subject cold-rolled imports." Final Determination at 24. The ITC provided two reasons for these findings, the first being that there was "no clear connection between the subject imports and the domestic price declines, since, during much of the period, the domestic price decreased even though subject imports were priced substantially higher." Id.

As discussed above, the price comparison underlying this first conclusion is flawed, since it is based on a comparison of AUVs, and not specific prices. Even if the AUV data could have been properly compared, however, the general conclusion the ITC drew from this data is also unsupported.

While the fact that "during much of the period, the domestic price decreased even though subject imports were priced substantially higher" might sufficiently answer the question of whether there was "significant price underselling," there is no reason why declining, though higher, prices for subject imports could not have depressed prices or prevented price increases for purposes of 19 U.S.C. § 1677(7)(C)(ii). Presumably, declining prices for subject imports would have such adverse effects, as domestic producers attempt to match falling import prices, and the fact that "domestic price[s] decreased even though subject imports were priced substantially higher," without more, does not show otherwise. Thus, besides relying upon inappropriate evidence for price comparison purposes, the ITC's analysis also fails to adequately explain why this data was not evidence of downward price pressure.[40]

Given these problems, the court turns to the ITC's second reason for finding no adverse price effects: the fact that "petitioners did not allege that domestic producers of cold-rolled plate experienced any lost sales or incurred any adverse price effects due to the cold-rolled subject imports." Final Determination at 24. As Defendant correctly observes, what a party says, or does not say, concerning its economic condition can be important evidence of injury or lack thereof. See Suramerica, 44 F.3d at 984 (stating, in regard to an ITC threat determination, that "[t]he industry best knows its own economic interests and, therefore, its views can be considered an economic factor. Indeed an industry's failure to acknowledge an affirmative threat has direct significance."). This court has also recognized, however, that anecdotal evidence of price suppression, by itself, may not always be highly probative. See, e.g.,

---

[40] Because the court agrees with this aspect of Plaintiffs' argument, it need not address Plaintiffs' claim that the Commission's conclusion is inconsistent with its findings, based on similar data, concerning hot-rolled plate. See Plaintiffs' Memorandum at 25-26.

Iwatsu, 15 CIT at 53 n.15, 758 F. Supp. at 1514 n.15 ("Both commissioners and the court have not

always been satisfied that anecdotal lost sales data is highly probative [of price suppression], but neither

has it been rejected outright, particularly if it is used corroboratively."); Lone Star Steel Co. v. United

States, 10 CIT 731, 733, 650 F. Supp. 183, 186 (1986) ("Anecdotal evidence of lost sales and

revenue rarely adds distinct information . . . .").


        Against this backdrop, Plaintiffs' failure to allege any lost sales or adverse price effects does not

constitute substantial evidence supporting the ITC's price determination. As noted earlier, the

Commission's AUV and volume data show that prices for both domestic and subject foreign cold-

rolled plate fell generally from 1995 to 1998, at the same time subject imports significantly increased

their market penetration. Such figures suggest that increasing, low-priced subject imports exerted

downward price pressure on domestic prices, and it is unreasonable to say that the lack of

corroborating evidence, by itself, indicates otherwise. See USX Corp. v. United States, 11 CIT 82,

86, 655 F. Supp. 487, 491 (1987) (holding ITC's sole reliance on the absence of confirmed allegations

of lost sales unsupported by substantial evidence). Certainly, inclusion of anecdotal evidence would

have strengthened Plaintiffs' claim of price suppression, and the lack of such evidence leaves open the

possibility of other causes for the decline in both domestic and subject import prices. The Final

Determination, however, does not provide any alternative explanation for the price declines, leaving

Plaintiffs' failure to allege lost sales or adverse price effects as the only reason for finding no price

suppression or underselling. In view of the record as a whole, the court cannot find this evidence

substantial. See Universal Camera, 340 U.S. at 488 ("The substantiality of evidence must take into

account whatever in the record fairly detracts from its weight.").[41]

In evaluating the ultimate question of whether the evidence relied on by the ITC sufficiently supports its injury determination, therefore, the court will not give weight to this portion of the Commission's findings.

---

[41] Defendant's Response cites the evidence noted in footnote 151 of the Final Determination as evidence that domestic producers of cold-rolled plate do not set their prices to compete with imports of subject, or even non-subject, cold-rolled plate. See Defendant's Response at 25. Had the Commission stated as much in the Final Determination, and if the evidence in footnote 151 supported such a finding, this would likely constitute sufficient evidence that the falling domestic prices were not related to falling subject import prices. Footnote 151, however, does not go that far. Rather, it simply notes that "Petitioners' main argument about subject cold-rolled imports at the Commission hearing was the claim that such imports are sold to fill orders for [hot-rolled] plate by foreign producers that are unable to achieve normal [hot-rolled] tolerances," and states that "[t]he Belgian producer responsible for the vast majority of subject cold-rolled imports refuted this claim in its posthearing brief, noting that customers specifically request a cold-rolled product." Final Determination at 24 n.151.

Nothing in the explanation, nor for that matter in the supporting evidence cited in footnote 151, shows that domestic and subject imported cold-rolled plate do not compete based on price. While this explanation shows Plaintiffs' belief that subject imports of cold-rolled plate are interchangeable with domestic hot-rolled plate, the evidence cited in footnote 151 shows that Plaintiffs advanced this point as support for their "like product" argument, and not with regard to its pricing policies. The court therefor reads footnote 151 as simply an explanation that petitioners' main argument before the agency concerned whether hot and cold-rolled plate were like products. Had the ITC intended to draw from this evidence a statement concerning petitioners' pricing of cold-rolled plate, it could and should have said so. Failing such a discernable explanation, however, the court declines to let Defendant's counsel read into the Final Determination a rationale not advanced by the commissioners themselves. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) ("The courts may not accept . . . counsel's post hoc rationalizations for agency action; . . . an agency's discretionary order [must] be upheld, if at all, on the same basis articulated in the order by the agency itself.").

**3**

**The Commission Erred in Applying the "Product Line Provision."**

Plaintiffs' last challenge concerns the ITC's analysis of the impact of subject imports on the health of the domestic industry. As noted above, 19 U.S.C. § 1677(7)(B)(i) mandates that, in addition to examining the volume of subject imports and their price effects in its material injury analysis, the ITC is to examine "the impact of [subject] imports . . . on domestic producers of domestic like products . . . in the context of production operations within the United States." 19 U.S.C. § 1677(7)(C)(iii) elaborates on this requirement, stating that

> In examining the impact required to be considered under subparagraph (B)(i)(III), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to--
>
> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
> (II) factors affecting domestic prices,
> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
> (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
> (V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.
>
> The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected indus

In the Final Determination, the ITC found that, while it was able to obtain some of this data for the domestic cold-rolled plate industry, the domestic industry was unable to provide segregated trade and financial data for cold-rolled plate. Final Determination at 25. Accordingly, the ITC relied upon

the "product line provision," 19 U.S.C. § 1677(4)(D), and "assess[ed] the effect of the cumulated

subject imports on the production of the narrowest group of products that includes cold-rolled plate for

which the necessary information could be provided -- in this case, all stainless steel coiled plate." Id.

Thus examining data for all domestic stainless steel plate production, the ITC noted that "the domestic

industry experienced declining financial performance and capital investment throughout the period as

well as declines in employment and capacity at the end of the period." Id. Despite this adverse

evidence, however, the ITC found that the small magnitude of subject cold-rolled plate imports could

not have caused such injury to the domestic stainless steel industry as a whole, stating that

> Due to the extremely small magnitude of subject imports of cold-rolled plate relative to domestic production of all certain stainless steel plate in coils, we do not find that cumulated subject imports of cold-rolled plate, despite their large share of the cold-rolled market and declining average unit values, are having an adverse impact on the domestic industry. In light of the limited commercial interchangeability between subject cold-rolled imports and domestic [hot-rolled] plate, which represents the vast majority of domestic production of certain stainless steel plate in coils, we find that subject cold-rolled imports are too small in magnitude to have contributed to the observed declines in the profitability, employment or capacity of the domestic industry producing certain stainless steel plate in coils. Accordingly, we determine that the domestic industry producing cold-rolled stainless steel plate in coils is not materially injured by reason of cumulated subject imports of cold-rolled plate from Belgium and Canada.

Id. (emphasis added).

Plaintiffs challenge this application of § 1677(4)(D) by arguing that the ITC improperly

examined whether subject imports of cold-rolled plate were responsible for the poor performance of

the stainless steel as a whole, thus "mixing apples and oranges" and necessitating a negative injury

determination. See Plaintiffs' Memorandum at 26-29. The court agrees.

The statute at issue, 19 U.S.C. § 1677(4)(D), provides that

> The effect of dumped imports or imports of merchandise benefiting from a countervailable subsidy <u>shall be assessed in relation to the United States production of a domestic like product if available data permit</u> the separate identification of production in terms of such criteria as the production process or the producer's profits. If the domestic production of the domestic like product has no separate identity in terms of such criteria, then <u>the effect of the dumped imports or imports of merchandise benefiting from a countervailable subsidy shall be assessed by the examination of the production of the narrowest group or range of products, which includes a domestic like product, for which the necessary information can be provided</u>. (emphasis added).

This provision makes clear that, when available data permits, the effect of unfairly traded imports is to be assessed in relation to only the U.S. production of the like product defined by the Commission, rather than the production of all products made by the domestic industry producing the like product.[42] The statute also makes clear that, when such segregated data is not available, the effect of the unfairly-traded imports shall be assessed by an examination of economic factors relating to a more aggregate level of production ("product line" data). What is not clear, however, is <u>how</u> product line data is to be employed. While § 1677(4)(D) states that the Commission shall assess the effect of unfairly-traded imports only "<u>in relation to</u> . . . <u>production of a domestic like product</u> if available data permit[s]," neither the language nor the legislative history of this statute specify the standard against which the ITC is to assess the impact of unfairly-traded imports if forced to rely on product line data. (<u>i.e.</u>, whether the broader data is to be used strictly as a proxy). Rather, and in contrast to the situation

---

[42] <u>See, e.g.</u>, S. Rep. No. 96-249 at 83-84 (1979), <u>reprinted in</u> 1979 U.S.C.C.A.N. at 469-70 ("In examining the impact of imports on the domestic producers comprising the domestic industry, the ITC should examine the relevant economic factors (such as profits, productivity, employment, cash flow, capacity utilization, etc.), as they relate to the production of <u>only</u> the like product, if available data permits a reasonably separate consideration of the factors with respect to production of only the like product.") (emphasis added); <u>General Motors Corp. v. United States</u>, 17 CIT 697, 701-02, 827 F. Supp. 774, 780 (1993) (citing 19 U.S.C. § 1677(4)(D) and stating that "[i]n this case, the like product consists of minivans; lost sales of other vehicles are not to be considered.").

where segregated data is available, the statute simply gives the general charge that "the <u>effect</u> of the [unfairly-traded] merchandise . . . <u>shall be assessed by the examination</u>" of product line data.

Notwithstanding this ambiguity, the ITC's interpretation and application of § 1677(4)(D) in this case was unreasonable.[43] The ITC, under the guise of using aggregate product line data, changed its basic inquiry from assessing the impact of subject cold-rolled plate imports on domestic production of cold-rolled plate to assessing the impact of such imports on domestic production of <u>all</u> stainless steel plate. In doing so, the ITC made it far more difficult to find material injury, since subject cold-rolled imports would necessarily have less impact on stainless steel production <u>as a whole</u> than they would on <u>only</u> production of cold-rolled plate. Moreover, comparing subject cold-rolled imports to total stainless steel production turned the ITC's "like product" determination on its head, by essentially ignoring its decision that cold and hot-rolled plate, and the industries producing these products, are distinct.

Nothing in the last sentence of § 1677(4)(D) reasonably allows such drastic changes. On its face, this provision simply provides that the ITC shall examine aggregate ("product line") data when segregated data is not available; it does not indicate that the unavailability of segregated data should make it less likely that subject imports are adversely impacting the domestic industry defined by the ITC, or that the unavailability of such data should eviscerate its finding of two domestic industries.

---

[43] Because the court finds the statute ambiguous, the court must determine whether the Commission's actions were based on a permissible (<u>i.e.</u>, reasonable) construction of the statute. <u>See</u> <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 843 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

Thus, because the ITC's use of product line data pursuant to § 1677(4)(D) made it harder for the domestic cold-rolled plate industry to establish material injury, the court finds neither the ITC's interpretation of this provision, nor its application of product line data, reasonable. While it may be true that subject cold-rolled plate imports did not negatively impact domestic cold-rolled plate production, the ITC's finding that "subject cold-rolled imports are too small in magnitude to have contributed to the observed declines . . . of the domestic industry producing certain stainless steel plate in coils" -- by essentially comparing "apples to oranges," rather than "apples to apples" -- does not reasonably support this conclusion.[44] The court therefor will not consider this finding in determining whether the Commission's finding of no material injury is adequately supported by the record as a whole. It is to this last question that the court now turn.

---

[44] During oral argument, Defendant's counsel argued that the ITC only made this comparison to determine what weight, if any, should be accorded the data. If this was the extent of the Commission's evaluation, such action would not be in error. As the ITC was forced to rely on financial and other information covering all stainless steel production, it was only appropriate that it question the propriety of using such data to measure the impact of subject imports on domestic cold-rolled plate production. Cf. Goss Graphics Sys., Inc. v. United States, 33 F. Supp.2d 1082, 1099 (1998), aff'd 216 F.3d 1357 (Fed. Cir. 2000) ("The Commission has the discretion to assess the probative nature of the evidence obtained in its investigation . . . . ").

A review of the Final Determination, however, shows no such limitation. Not only is there no indication, either explicit or implied, that the ITC's analysis relates only to the probative weight that should be given such product line data, but the language used by the ITC makes clear that its impact analysis was based upon the state of the stainless steel plate industry as a whole. See, e.g., Final Determination at 25 ("Accordingly, we determine that the industry producing cold-rolled stainless steel plate in coils is not materially injured by reason of cumulated subject imports of cold-rolled plate from Belgium and Canada.") (emphasis added). Thus, while the court finds no fault in counsel's argument that the Commission may evaluate the probative weight of product line data, it declines to find that is all the ITC did here. See Burlington Truck Lines, 371 U.S. at 169 ("[A]n agency's discretionary order [must] be upheld, if at all, on the same basis articulated in the order by the agency itself.").

**4**

### The Domestic Industry's Lack of Interest in the Cold-Rolled Plate Market Is Substantial Evidence Supporting the ITC's Finding of No Material Injury.

Having established that the ITC erred in making various subsidiary findings, the court's last, and ultimate, query is whether any or all of these errors make the ITC's ultimate conclusion "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). To make this determination, the court must disregard those subsidiary findings that are unsupported or otherwise unlawful, and determine whether the remaining evidence relied on by the ITC is such that "it would have been possible for a reasonable jury to reach the [Commission's] conclusion." Allentown Mack Sales and Service, Inc. v. NLRB, 522 U.S. 359, 366-67 (1998); see also U.S. Steel, 96 F.3d at 1364-65 ("Even if the Commissioners' subsidiary price-suppression finding was not supported by substantial evidence, however, we find that the other evidence relied on by [the commissioners], taken as a whole, was sufficient to support their ultimate conclusion."). Upon close review of this remaining evidence, and in light of the evidence of record which detracts from its substantiality, the court finds sufficient support for the Commission's negative injury determination.

The Final Determination reveals essentially three bases for the ITC's finding that, despite rising volume and decreasing AUVs, subject cold-rolled imports did not cause material injury to the domestic cold-rolled plate industry: (1) subject imports did not exert price pressure on domestic prices and, thereby, decrease domestic revenues; (2) subject imports of cold-rolled plate were too small in magnitude to account for the observed declines in profitability, employment and capacity of the domestic stainless steel industry as a whole; and (3) the domestic industry did not consider cold-rolled

plate an important part of its business.  For the reasons stated above, the court notes that grounds one

and two do not reasonably support the ITC's conclusion.  The question thus becomes whether the

ITC's last stated ground, lack of interest, is sufficient by itself.

The ITC made three statements concerning the domestic industry's interest in selling cold-rolled

plate: (a) a statement in its "volume" analysis that "the domestic industry's production of cold-rolled

plate is very limited and that the industry itself has characterized cold-rolled plate as a tiny and

unimportant part of its business"; (b) a statement in its "impact" analysis that "none of these domestic

producers actively markets or promotes the product"; and (c) a statement in its "impact" analysis that

"high level marketing personnel from the domestic industry were unaware in some instances that their

companies could or did produce a cold-rolled product."  Final Determination at 23-25.  In support of

these statements, the ITC cited the following evidence:

- Statements by three domestic producers during the Commission's hearing on March 23, 1999, that they do not see any real market for cold-rolled plate.[45]  See id. at 23 n.145 and 24 n.153 (citing Hearing Tr. at 50-51);

- A statement by an economic consultant for the domestic industry at the hearing that any domestic production of cold-rolled plate is "accidental."  See id. at 23 n.145 and 24 n.153 (citing Hearing Tr. at 114);

- A letter from domestic producer J&L Specialty Steel, Inc. listing its cold-rolled plate

---

[45] See Hearing Tr. at 50 (statement of Robert W. Rutherford, Senior Vice President-Commercial, Allegheny Ludlum Corp., that Allegheny has "the capability of making cold-rolled coiled plate, but there just isn't market for it, as we see it.") (statement by Leonard Arnold, Sales Manager, North American Stainless, that although "North American Stainless has the capability of producing cold-rolled plate," "[t]he market for this product is almost insignificant, and furthermore, our capability and thickness is rather limited") and 51 (statement by David Pudelsky, Vice-President-Commercial, J&L Specialty Steel, Inc., that "J&L does have the ability to make a cold-rolled plate product, but there really has not been a market for that, and that is why we have not produced cold-rolled plate.").

sales for 1995-98 and noting that "[b]ecause of the small quantity of shipments, and no inventory programs on J&L's part, it should be assumed that shipments equaled production and no beginning/ending inventory existed." See id. at 23 n.145 and 24 n.153 (citing Petitioners' Posthearing Brief, Ex. 5);

- A statement by David Pudelsky, Vice-President-Commercial of J&L, indicating that he was not sure whether J&L produces cold-rolled plate in response to cold-rolled orders. See id. at 25 n.154 (citing, inter alia, Hearing Tr. at 120-21 and comparing Mr. Pudelsky's statement to the later admission that, after research, Allegheny and J&L discovered that they had produced cold-rolled plate during the period of investigation); and

- A statement by Leonard Arnold, Sales Manager for North American Stainless, concerning North American's production of cold-rolled plate that was later admitted to be inaccurate. See id. at 25 n.154 (comparing Mr. Arnold's statement that North American produced cold-rolled plate to petitioners' subsequent admission in their Posthearing Brief that North American did not produce this product).

The statements by Robert Rutherford that Allegheny Ludlum has "the capability of making cold-rolled coiled plate, but there just isn't market for it, as we see it," the statement by Leonard Arnold of North American Stainless that "[t]he market for [cold-rolled plate] is almost insignificant," and the statement by David Pudelsky that "J&L does have the ability to make a cold-rolled plate product, but there really has not been a market for that, and that is why we have not produced cold-rolled plate," as well as the other evidence cited in the Final Determination, show that the main domestic producers (or potential producers) of cold-rolled plate had little interest in selling this product. Such evidence provides a basis for the Commission's conclusion that subject imports did not cause material injury to the domestic cold-rolled plate industry, since it indicates that domestic cold-rolled plate production would have remained minimal even if increasing subject imports had exerted negative price pressures on domestic cold-rolled plate prices. This evidence strongly suggests that any injury to domestic cold-rolled plate production was caused not by increasing subject imports, but by the industry's perception

that the small market for cold-rolled plate was not worth pursuing.

Is the evidence, however, sufficient to support the Commission's ultimate conclusion? Record evidence detracting from the substantiality of the above includes, most significantly, the fact that over the period of investigation (1) subject imports increased significantly; (2) both domestic and subject import cold-rolled prices declined; (3) domestic production remained minimal; and, to a lesser degree, (4) the entire stainless steel plate industry experienced declining financial performance, capital investment, employment and capacity. See Final Determination at 23-25. This evidence does not render the Commission's conclusion unreasonable. Without more, such evidence simply indicates that subject imports might be causing injury to the domestic cold-rolled plate production; it neither establishes injury to cold-rolled plate production, nor does it demonstrate any link between subject imports and such production. In contrast, the domestic industry's own statements concerning cold-rolled production specifically, by reflecting its views of why domestic production remained minimal, were perhaps the most probative causation evidence before the Commission. See Suramerica, 44 F.3d at 984 ("The industry best knows its own economic interests and, therefore, its views can be considered an economic factor. Indeed an industry's failure to acknowledge an affirmative threat has direct significance."); cf. Oregon Steel Mills Inc. v. United States, 862 F.2d 1541, 1543-46 (Fed. Cir. 1988) (lack of industry support a sufficient basis for revoking antidumping order). Accordingly, the court finds that a reasonable trier of fact could view this evidence as sufficient, by itself, to support a finding that subject imports were not materially injuring the domestic cold-rolled plate industry.

In their Memorandum, Plaintiffs challenge the ITC's treatment of this evidence by arguing that it improperly combined data for two separate products and industries in analyzing injury to only the cold-

rolled plate industry, in violation of 19 U.S.C. § 1677(4)(D). <u>See</u> Plaintiffs' Memorandum at 18-19.[46]

The ITC's statements that "the domestic industry's production of cold-rolled plate is very limited" and

"the industry itself has characterized cold-rolled plate as a tiny and unimportant part of its business,"

<u>Final Determination</u> at 23, do imply that the ITC based its injury determination on the limited size of

cold-rolled plate production relative to all domestic stainless steel plate production. Had the

Commission drawn such a comparison for purposes of showing no injury to the domestic stainless steel

industry <u>as a whole</u>, the ITC would be engaging in the kind of inappropriate "apples to oranges"

comparison discussed in section III.C.3. above.

 

The evidence cited in support of these statements, however, as well as the evidence cited in

footnotes 153 and 154 of the <u>Final Determination</u>, reveals no similar error. The evidence cited in the

footnotes, discussed above, concerns <u>only</u> domestic interest in, and knowledge of, cold-rolled plate

production. <u>See, e.g.</u>, Hearing Tr. at 50 (statement of Robert W. Rutherford, Senior Vice President-

Commercial, Allegheny Ludlum Corp., that Allegheny has "the capability of making cold-rolled coiled

plate, but there just isn't market for it, as we see it."). It neither shows an inappropriate mixing of

evidence concerning hot and cold-rolled plate production,[47] nor does it show that the ITC

inappropriately compared cold and hot-rolled production to illustrate the relative unimportance of the

---

[46] Plaintiffs specifically challenge the ITC's statement that "the domestic industry's production of cold-rolled plate is very limited and that the industry itself has characterized cold-rolled plate as a tiny and unimportant part of its business." <u>Final Determination</u> at 23.

[47] <u>Compare</u> <u>Alberta Pork</u>, 11 CIT 563, 669 F. Supp. 445 (finding that the ITC erred in combine data for two separate products and industries to analyze injury to one industry alone).

former.  Rather, these statements go simply to the question of whether the cold-rolled plate industry[48]

was substantially interested in producing cold-rolled plate -- an inquiry which is highly probative of

whether subject cold-rolled plate imports caused this industry material injury.  The court therefore does

not find that the ITC, in analyzing these statements, improperly combined data for two separate

products and industries.

> As a final challenge to the substantiality of this evidence, Plaintiffs argue that
>
> > [The] Commission's suggestion that the domestic industry has abandoned the cold-rolled plate market because of the industry [sic] were not aware of specific details concerning cold-rolled plate sales is incorrect.  No executive could be expected to know details of specific transactions constituting an infinitesimal proportion of a company's business.
>
> Plaintiffs' Reply at 13.

---

[48] Although the ITC referenced all stainless steel producers in discussing, inter alia, the cold-rolled plate industry's interest in selling cold-rolled plate, see, e.g., Final Determination at 24 ("despite the universal ability among domestic [hot-rolled] plate producers to produce cold-rolled plate, none of these domestic producers . . . .  Indeed, high level marketing personnel from the domestic industry were unaware . . . ."), by itself this fact does not show a misapplication of § 1677(4)(D).  Although the ITC found separate domestic industries for both hot and cold-rolled plate, the record shows that the same producers generally compose both industries, and Plaintiffs have not argued otherwise.  See, e.g., Final Determination at 5 (noting that "[a]ll domestic producers have the ability to produce cold-rolled stainless steel coiled plate") and 7 ("The production of cold-rolled plate typically begins with [hot-rolled] plate."); see also Plaintiffs' Memorandum at 14 (arguing that "[m]anufacturing operations also do not distinguish hot-rolled and cold-rolled stainless plate products.").

Given this overlap, and in light of the fact that the ITC did not distinguish between the two products in its preliminary determination, it is neither surprising nor per se incorrect that the ITC referenced the domestic stainless steel plate industry when referring to cold-rolled plate producers.  Nevertheless, because such general references to the "domestic industry" raise questions of whether the ITC inappropriately compared different levels of production in its injury analysis, the ITC is advised to use greater care in specifying the domestic industry it refers to -- specifically where, as here, it defines separate like products and domestic industries.

While it may be true that an executive would not generally know "details of specific transactions constituting an infinitesimal proportion of a company's business," it is reasonable to assume that an executive would research his company's production of a product before testifying before the ITC about that product. Moreover, even disregarding the inaccurate statements by David Pudelsky of J&L and Leonard Arnold of North American Stainless about their company's specific production of cold-rolled plate, other record evidence cited by the ITC sufficiently establishes that these executives (as well as Robert W. Rutherford of Allegheny Ludlum) were nevertheless familiar with -- and disinterested in -- the market for cold-rolled plate. See, e.g., Hearing Tr. at 50 (statement by Leonard Arnold that although North American "has the capability of producing cold-rolled plate," "[t]he market for this product is almost insignificant, and furthermore, our capability and thickness is rather limited") and 51 (statement by David Pudelsky that "J&L does have the ability to make a cold-rolled plate product, but there really has not been a market for that, and that is why we have not produced cold-rolled plate"). The court therefore finds no merit to this final argument, and accordingly concludes that the cold-rolled plate industry's admitted lack of interest in producing cold-rolled plate was a sufficient evidentiary and legal basis for finding no material injury by reason of subject imports.[49]

---

[49] During oral argument, Plaintiffs' counsel, in response to questions from the court, stated that the domestic industry is concerned with cold-rolled plate production insofar as foreign producers may circumvent an antidumping order on hot-rolled plate by cold-rolling their product. This concern over the substitutability of subject imported cold-rolled plate for domestic hot-rolled plate, however, touches on the propriety of the ITC's like product analysis, and not on whether domestic cold-rolled plate production was injured by subject cold-rolled plate imports. Having found hot and cold-rolled plate to be separate products, the ITC was required to focus on the cause of injury (if any) to only domestic cold-rolled plate production, and Plaintiffs' explanation fails to mitigate the impact of the executives' statements on this question.

## IV

## CONCLUSION

At issue in this case is the often difficult question of when agency action should be affirmed in the face of underlying errors. In one sense, mistakes in an agency's analysis suggest the appropriateness of a remand since, when confronted with a mistake of any significance, there is a possibility that the agency may have sought further information or (if sufficient evidence allowed) even arrived at a different result. Allowing an agency such a "final say" would respect its role as fact-finder, and would presumably result in nearly error-free investigations following remand. It would also, however, entail a rigid and aggressive standard of review going well beyond the substantial evidence test.

As noted above, Congress has charged this court with reviewing findings by the ITC and Commerce to determine if they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" review, though requiring a thorough evaluation, is largely a deferential standard. As the Supreme Court recently observed, this standard calls upon the court to "decide whether on [the] record it would have been possible for a reasonable jury to reach the [agency's] conclusion." Allentown, 522 U.S. at 366-67 (emphasis added). In making this determination, the court must set aside agency action "when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." Universal Camera, 340 U.S. at 488.

In the Final Determination, the ITC erred in analyzing the possible price effects of subject imports, as well as the impact (if any) of such imports on the health of the domestic cold-rolled plate industry. Such mistakes, however, do not per se require a remand. Rather, under the substantial evidence standard, the court must disregard such unsupported or unlawful subsidiary findings in making its ultimate determination of sustainability. When subtracting such subsidiary findings "leaves so little evidence on the record as to be less than a 'mere scintilla' or less than that which 'a reasonable mind might accept as adequate to support a conclusion,'" remand will lie. Atlantic Sugar, 744 F.2d at 1563. Where, however, those remaining facts[50] are such that a reasonable jury could still have reached the agency's conclusion, notwithstanding the record evidence which fairly detracts from its weight, agency action must be affirmed. See U.S. Steel, 96 F.3d at 1364-65 ("Even if the Commissioners' subsidiary price-suppression evidence was not supported by substantial evidence, however, we find that the other evidence relied on . . ., taken as a whole, was sufficient to support their ultimate conclusion.").

In this case, the Commission identified significant evidence showing that the domestic cold-rolled plate industry was not interested in producing and selling cold-rolled plate. Even in light of record evidence detracting from the substantiality of this evidence (namely, evidence that subject imports were increasing and had declining AUVs), this evidence is sufficient to support a finding that such imports did not cause material injury to the cold-rolled plate industry. The court therefore denies Plaintiffs' Rule 56.2 Motion For Judgment Upon The Agency Record, and affirms the Final Determination here at issue. Judgment to this effect shall be entered accordingly.

_____
Evan J. Wallach, Judge

Dated:       August 28, 2000
             New York, New York

_____

[50] Of course, those remaining facts must have been identified by the agency in support of its findings. See Burlington Truck Lines, 371 U.S. at 169 ("[A]n agency's discretionary order [must] be upheld, if at all, on the same basis articulated in the order by the agency itself.").