**Slip Op. 02-39**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| USINOR INDUSTEEL, S.A., DUFERCO CLABECQ, S.A., AG der DILLINGER HÜTTENWERKE, SALZGITTER AG STAHL und TECHNOLOGIE, and THYSSEN KRUPP STAHL AG, | : : : : : |
| Plaintiffs, | : : |
| v. | : Consolidated Court : No. 01-00006 : |
| THE UNITED STATES, | : **Public Version** : |
| Defendant, | : : |
| and | : : : |
| BETHLEHEM STEEL CORPORATION and U.S. STEEL GROUP, A UNIT OF USX CORP., | : : : |
| Defendant-Intervenors. | : : |

[ITC sunset review determination remanded.]

Dated: April 29, 2002

Barnes, Richardson, & Colburn (Gunter von Conrad and Stephen W. Brophy) for plaintiff Usinor Industeel, SA.

White and Case LLP (Walter J. Spak, Lyle B. Vander Schaaf, Joseph H. Heckendorn, and Caleb W. Sullivan) for plaintiff Duferco Clabecq, S.A.

DeKieffer and Horgan (J. Kevin Horgan and Marc E. Montalbine) for plaintiffs AG der Dillinger Hüttenwerke, Salzgitter AG Stahl und Technologie and Thyssen Krupp Stahl AG.

Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy General Counsel, United States International Trade Commission (Rhonda M. Hughes), for defendants.

Dewey Ballantine LLP (Alan Wm. Wolff, Kevin M. Dempsey, and Rory F. Quirk) and Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, and James C. Hecht) for defendant-intervenors Bethlehem Steel Corporation, U.S. Steel Group, a unit of USX Corporation.

## OPINION

**RESTANI, Judge:**  This consolidated matter is before the court on a motion for judgment based upon the agency record pursuant to USCIT Rule 56.2.  The motion has been brought by Usinor Industeel, S.A., Duferco Clabecq, S.A., AG der Dilllinger Hüttenwerke, Salzgitter AG Stahl und Technologie and Thyssen Krupp Stahl AG (collectively "Plaintiffs"), respondents in the underlying antidumping investigation.  Plaintiffs challenge certain aspects of the final determination of the U.S. International Trade Commission ("Commission" or "ITC") in its five-year sunset review of antidumping and countervailing orders in Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 65 Fed. Reg. 75,301 (Int'l Trade Comm'n 2000) ("Final Determination").  Plaintiffs primarily challenge the Commission's decision to cumulate subject imports from Belgium and Germany with those from other countries on the ground that conditions of competition in European Community ("E.C.") changed substantially between the initial investigation and this sunset review.  Plaintiffs also challenge the Commission's affirmative competition overlap determination, arguing that the Commission applied an improper statutory standard and, generally, that the Commission's finding of likely material injury was not supported by substantial evidence.

**JURISDICTION**

This action commenced under section 516A(a)(2)(A)(i)(I) and (B)(iii) of the Tariff Act of 1930, as amended (the "Act"). 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (B)(iii) (1999). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).

**BACKGROUND**

On September 1, 1999, the Commission instituted five-year sunset reviews, pursuant to section 751 of the Act, to determine whether revocation of antidumping and countervailing duty orders on certain carbon steel products[1] from various countries would likely lead to continuation or recurrence of material injury to the domestic industry. See Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 64 Fed. Reg. 47,862 (Int'l Trade Comm'n 1999) (institution of five year reviews). On December 21, 1999, the Commission decided to conduct full five-year reviews for all orders. See Certain Carbon Steel Products from Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 64 Fed. Reg. 71,494 (Int'l Trade Comm'n 1999) (notice of Commission determination to conduct full five-year reviews).

On December 1, 2000, the Commission published notice of its final affirmative determination. Final Determination, 65 Fed. Reg. 75,301. The Commission unanimously found

---

[1] The reviews covered three separate products: (1) cut-to-length carbon steel plate; (2) cold-rolled carbon steel flat products; and (3) corrosion-resistant carbon steel plate. Plaintiffs' challenge is limited to cut-to-length carbon steel plate.

that revocation of the antidumping and countervailing duty orders on cut-to-length carbon steel

plate ("CTL plate") from Belgium, Brazil, Finland, Germany, Mexico, Poland, Romania, Spain,

and Sweden would likely lead to a continuation or recurrence of material injury to the domestic

industry. Id.[2] Plaintiffs' challenge here is directed at retention of the antidumping orders.

The determinations at issue reviewed a 1979 antidumping duty order on carbon steel plate

from Taiwan[3] and a 1993 antidumping duty order on CTL plate from various countries including

Belgium and Germany.[4] Id. Plaintiffs Usinor Industeel, SA ("Usinor") and Duferco Clabecq,

S.A. ("Duferco") are Belgian producers and exporters of CTL plate. Plaintiffs AG der Dilllinger

Hüttenwerke, Salzgitter AG Stahl und Technologie and Thyssen Krupp Stahl AG (collectively,

the "German Producers") are German producers and exporters of CTL plate. Usinor, Duferco,

and the German Producers (collectively "Plaintiffs") participated in the review proceedings and

contest the Final Determination here. The U.S. producers participating in the review were

Bethlehem Steel Corp. ("Bethlehem"), U.S. Steel Group, a Unit of USX Corp. ("U.S. Steel"),

_____

[2] The Commission voted 6-0 that revocation of orders on CTL plate from Canada would not likely lead to continuation or recurrence of material injury to the domestic industry. Id. By a vote of 4-2, the Commission determined that revocation of the orders CTL plate from the United Kingdom would likely lead to continuation or recurrence of material injury. By a vote of 5-1, the Commission determined that revocation of the orders on CTL plate from Taiwan would likely lead to a continuation or recurrence of material injury.

[3] On May 12, 1979 the Commission determined that imports of plate from Taiwan injured or were likely to injure a regional industry in the United States. See Carbon Steel Plate from Taiwan, USITC Pub. 970, AA1921-197 (May 1979).

[4] The 1993 period of review ("POR") was 1990 to 1992. See Certain Flat-Rolled Carbon Steel Products from Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, the Republic of Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom, USITC Pub. 2664, INV. Nos. 701-TA-319 to 332, 334, 336 to 342, 344, and 347 to 353 (final); and 731-TA-573 to 579, 581-592, 594 to 597, 599 to 609, and 612 to 619 (final) (Aug. 1993) (hereinafter "1993 ITC Determination").

Gulf States Steel, Inc., U.S. Denro Steel, Inc., and IPSCO Steel, Inc. (collectively the "Domestic

Producers"). Bethlehem and U.S. Steel are Defendant-Intervenors in the present action.

Pursuant to 19 U.S.C. § 1675a(a)(7), the Commission elected to cumulate likely volume

and price effects from all countries except Canada.[5] Final Determination at 29. In support of

cumulation, the Commission found that: (1) subject imports from all countries except Canada

were likely to have a discernible adverse impact on the domestic industry if orders were revoked;

(2) there would be reasonable overlap of competition between subject imports from all countries

and the domestic like product if orders were revoked; and (3) except for Canada, no significant

differences in the conditions of competition existed between the remaining countries. Id. at 29-

37.

Upon cumulation, the Commission determined that material injury was likely if orders

were revoked. In support, the Commission found that volume of cumulated subject imports

would likely be significant if orders were revoked.[6] Id. at 40-42. The Commission found that

---

[5] With respect to Canada, only one of the three major Canadian producers to which the antidumping duty order applied, Stelco, remained subject to the order. IPSCO was excluded pursuant to a remand determination in 1995 that lowered its margin to de minimis and Commerce revoked the order on Algoma in 1999. Staff Report at PLATE-IV-3. The Commission determined that likely future levels of subject imports from Canada would not be significant, that the probable volumes would likely be too small to affect domestic prices significantly and, in the absence of significant volume or price effects, that the likely impact of subject imports from Canada on the domestic plate industry, in the event of revocation, would not be significant. Accordingly, the Commission found that subject imports from Canada would not lead to continuation or recurrence of material injury within a reasonably foreseeable time if the order were revoked. Final Determination at 48-49.

[6] The Commission's volume analysis was ostensibly based on significant foreign production capacity and excess capacity to produce both subject and non-subject plate products, foreign plate inventories, significant exports by most producers of subject plate (indicating that exporting is an important part of these producers' businesses), and barriers to exporting to third countries. Id. at 40-42. In addition, the Commission found that the incentive for foreign

increased volume of CTL plate would undersell domestic like products and have significant price suppressing and depressing effects within a reasonably foreseeable time. Id. at 43. Finding that revocation of orders would likely lead to increases in volume with significant adverse price effects, the Commission determined that, because of the vulnerability of the domestic industry, the cumulated effects would likely have a significant adverse impact on the domestic industry and would likely cause the domestic industry to lose market share. Id. at 47.

The Commission concluded that if orders were revoked, subject imports from Belgium, Brazil, Finland, Germany, Mexico, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom would be likely to enter the U.S. market in sufficient quantities and at prices below those of the domestic like product so as to have a significant adverse impact on the domestic industry within a reasonably foreseeable time. Id. at 46-48. In light of these conclusions, the Commission found that revocation of the orders would likely lead to a continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time. Id. at 49-50. Plaintiffs challenge the Commission's decision to cumulate Belgian and German imports with those of the remaining countries, as well as the Commission's affirmative determination upon cumulation.

---

producers to increase sales to maximize the use of available capacity, the role of increasingly consolidated service centers in seeking out sources of low-cost supplies, as well as the price-sensitive nature of the domestic plate market and the weakened condition of the domestic industry indicated that the volume of subject imports would likely be significant. Id.

STANDARD OF REVIEW

The Commission's determinations in five-year sunset reviews will be upheld unless the

court determines that they are "unsupported by substantial evidence on the record, or otherwise

not in accordance with law."  19 U.S.C. § 1516a(B)(1)(b)(1).

DISCUSSION

## I. Cumulation

Plaintiffs challenge the Commission's decision to cumulate imports from Belgium[7] and

Germany with imports from other countries.  Cumulation is discretionary in sunset reviews.  See

19 U.S.C. § 1675a(a)(7); see also Eveready Battery Co. v. United States, 77 F. Supp. 2d  1327,

1331 (Ct. Int'l Trade 1999); Statement of Administrative Action, ("SAA") accompanying

H.R.Rep. No. 103-826(I), at 887, reprinted in 1994 U.S.C.C.A.N. 4040, 4212.  Section

1675a(a)(7) provides that:

> [T]he Commission may cumulatively assess the volume and effect of imports of the
> subject merchandise from all countries with respect to [sunset reviews that] were initiated
> on the same day, if such imports would be likely to compete with each other and with
> domestic like products in the United States market.

Id. (emphasis added).  The statute prohibits cumulation if the Commission determines that

subject imports are likely to have "no discernible adverse impact" on the domestic industry.  Id.

In order to satisfy this provision, the Commission must also determine that "a reasonable overlap

of competition" exists between imports from different countries.  Wieland Werke, AG v. United

States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989).  In addition to these statutory requirements,

---

[7]  There were two CTL plate producers in Belgium during the POR, Duferco and
Fabrique de Fer de Charleroi, S.A. (now Usinor).  Staff Report at PLATE-IV-1.

the Commission analyzes the "overall similarities in the conditions of competition that would prevail if the finding and orders are revoked." Certain Steel Wire Rope from Japan, Korea, and Mexico, USITC Pub. 3259, INV. Nos. 731-TA-547, at 11 (Dec. 1999) (five-year review). Plaintiffs challenge the Commission's affirmative determinations with respect to each.

**A. Discernible Impact**

The Commission may not cumulatively assess the volume and effects of subject imports if it determines that such imports are "likely to have no discernible adverse impact on the domestic industry." 19 U.S.C. § 1675a(a)(7). Citing the absence of any guidance in the statute or SAA, the Commission states that it "generally considers the likely volume of the subject imports and the likely impact of those imports on the domestic industry within a reasonably foreseeable time." Final Determination at 22. In terms of product mix, the Commission found "a reasonable overlap" between the types of plate products manufactured in each subject country and those produced in the United States and, therefore, imports are likely to be substitutable for and competitive with domestic plate. Id. at 31 (citing Domestic Producer Questionnaire Responses, C.R. Doc. 236, Tables CTL-SUPP-13 through 24). Focusing primarily on foreign excess capacity[8] and the ability of the foreign producers to produce all types of plate products, the Commission found that volume of subject imports was likely to increase significantly if orders were revoked. Relying heavily upon the weakened condition of the domestic industry, the Commission determined that this increased volume would have a discernible adverse impact on

_____

[8] The Commission calculated that capacity in each country was equivalent to over five percent of U.S. consumption, except with regard to Canada. Final Determination at 30 n.98 (citing Staff Report, Tables PLATE-IV-3 through 13 (summarizing capacity and capacity utilization for subject countries)). The Commission found the size of the industry in each country significant when compared to U.S. consumption. Final Determination at 30.

the domestic industry.  Plaintiff Usinor challenges this determination arguing that: (1) the

Commission's discernible impact methodology lacks a consistent analytical framework; and (2)

Belgium was entitled to a country-specific analysis.

>             *1. Differing Analytical Frameworks*

In lieu of explaining individual Commissioner's discernible adverse impact

methodologies, the Final Determination referred to prior sunset reviews for a discussion of the

various analytical frameworks used by Chairman Koplan and Commissioners Hillman, Miller

and Bragg in applying the "no discernible adverse impact" provision.[9]  Final Determination at 22,

nn.73-74.  Usinor claims that Chairman Koplan and Commissioner Bragg improperly analyzed

the sunset review cumulation provision as a negligibility provision.  Usinor misstates Chairman

Koplan's position.  In the decisions cited, the commissioners read the "no discernible adverse

impact" provision "to be largely a negligibility provision without the use of a strict numerical test

of the sort now required by the statute in original antidumping and countervailing duty

investigations."  Malleable Cast Iron Pipe Fittings, Sep. Views of Comm'rs Miller & Hillman at

12, Sep. Views of Comm'r Koplan at 25-26 n.3.  The Commissioners interpreted the provision to

require a focus on the total volume of imports that would likely occur in the event of revocation

of the orders rather than the change in volumes of such imports,  Malleable Cast Iron Pipe

Fittings, Sep. Views of Comm'rs Miller & Hillman at 12; Iron Metal Castings, Views of Comm'r

---

[9] Chairman Koplan and Commissioner Miller referred to their discussion of cumulation in their separate views in Malleable Cast Iron Pipe Fittings from Brazil, Japan, Korea, Taiwan, and Thailand, USITC Pub. 3274, Inv. Nos. 731-TA-278-280 (Review), 731-TA-347-348 (Review) (Feb. 2000).  Chairman Koplan also cited his individual discussion of cumulation in Iron Metal Castings from India; Heavy Iron Construction Castings from Brazil; and Iron Construction Castings from Brazil, Canada and China, USITC Pub. 3247, Inv. Nos.  303-TA-13 (Review); 701-TA-249 (Review); and 731-TA-262, 263 & 265 (Review) (Oct. 1999).

Koplan at 28, and an evaluation of the likely conditions of competition as well. Malleable Cast Iron Pipe Fittings, Sep. Views of Comm'rs Miller & Hillman at 12-13; Iron Metal Castings, Views of Comm'r Koplan at 28. That interpretation is consistent with the methodology employed here and is not contrary to the discretionary cumulation standard.

Commissioner Bragg referred to her discussion of cumulation in Potassium Permanganate from China and Spain, USITC Pub. 3245, Inv. Nos. 731-TA-125 to 126 (Review) (Oct. 1999) and Brass Sheet and Strip from Brazil, Canada, France, Germany, Italy, Japan, Korea, the Netherlands, and Sweden, USITC Pub. 3290, Inv. Nos. 701-TA-269 & 270 (Review), 731-TA-311-317 & 379-380 (Review) (Apr. 2000). Commissioner Bragg first determines: (1) whether the reviews were initiated on the same day, and (2) whether there is a likely reasonable overlap in competition if orders are revoked. If so, Commissioner Bragg then examines whether such imports are likely to have no discernible adverse impact on the domestic industry. Potassium Permanganate, Sep. Views of Comm'r Bragg at 27; Brass Sheet and Strip, Sep. Views of Comm'r Bragg at 27.

Usinor argues that under19 U.S.C. § 1675a(a)(7), the Commission must make an affirmative determination that discernible adverse impact is likely before analyzing competition overlap. Usinor's objection fails here for two reasons. First, Commissioner Bragg ultimately determined that subject imports from Belgium alone would likely have a discernible adverse impact if orders were revoked.[10] Final Determination, Sep. Views of Comm'r Bragg at 27.

---

[10] Consistent with the majority methodology, Commissioner Bragg based her discernible adverse impact determination on excess capacity noting that Belgium possessed approximately [
] tons of excess capacity to produce subject plate and [          ] tons of excess capacity to produce all plate. Belgian producers' inventories of subject merchandise were [          ] tons at the end of the interim period, and that total unused capacity plus end-of-period inventories were

Second, a majority of the Commission employed other uncontested analyses. Therefore, the court need not remand even if Commissioner Bragg's analysis were faulty. See Ad Hoc Comm. of Domestic Uranium Producers v. United States, 162 F. Supp. 2d 649, 654 (Ct. Int'l Trade 2001) (not reaching the issue of significance of different production capacities and inventories where other factors cited by the Commission were deemed adequate). Differing methodologies by individual commissioners is not, by itself, sufficient to require remand. See, e.g., Neenah Foundry Co. v. United States, 155 F. Supp. 2d 766 (Ct. Int'l Trade 2001) (upholding distinct approaches on discernible adverse impact); Cemex, S.A. v. United States, 16 CIT 251, 252, 790 F. Supp. 290, 292 (1992) (ITC's determination affirmed when two majority commissioners utilized different analyses).

### 2. Country-Specific Analysis

Usinor next argues that the Commission did not analyze each country individually in making its findings, and specifically failed to discuss its analysis with respect to Belgium. In support of its discernible impact determination, the Commission specifically referred to that portion of the Staff Report analyzing the Belgian CTL plate industry. Final Determination at 30 n.101. The Staff Report analyzes the facts specific to subject imports from Belgium. Staff Report at PLATE-IV-1 through 3. While citation to the staff report is not ideal, the court can deduce from the Commission's reference that: (1) CTL plate accounts for a substantial portion of Belgian sales;[11] (2) that Usinor itself reported that [

---

equivalent to approximately [      ] percent of domestic production during 1999, and [      ] percent of apparent domestic consumption that year.

[11] The Staff Report states that CTL plate accounted for between [          ] percent of the Belgian Mills' total sales in the most recent fiscal year. Staff Report at PLATE-IV-1, 2.

]; and (3) that Belgium exports the majority of CTL plate produced.[12] The Belgium specific analysis in the Staff Report is consistent with the Commission's general finding in the Final Determination. Id. at 30 (noting size of industry, capacity to produce all types of plate products, and export orientation in support of general finding).

### B. Competition Overlap

The Commission states that it generally considers four factors to determine whether competition overlap is likely: (1) the degree of fungibility between the imports from different countries and between imports and the domestic like product; (2) the presence of sales or offers to sell in the same geographical markets of imports from different countries and the domestic like product; (3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product; and (4) whether the imports are simultaneously present in the market. Final Determination at 23, n.76; see also Wieland Werke, AG v. United States, 13 CIT 561, 563 (1989). These factors are neither exclusive nor determinative. See Goss Graphics Sys. v. United States, 33 F. Supp. 2d 1082, 1086 (Ct. Int'l Trade 1998). In finding that competition overlap is likely, the Commission made affirmative determinations as to each factor. Final Determination at 31-33. Duferco contests each finding, arguing that the Commission did not apply the proper statutory standard and that the determinations are not supported by substantial evidence.

---

[12] The Staff Report notes that, in 1999, over [    ] percent of Duferco's sales were to other European countries. Staff Report at PLATE-IV-2; Table PLATE-IV-3. Duferco and Usinor are the only producers of CTL plate in Belgium.

*1. "Likely"*

Plaintiff Duferco argues that the Commission failed to properly construe the phrase "likely" under 19 U.S.C. § 1675.[13]  The Act does not expressly define the term likely. "[U]ndefined terms in a statute are deemed to have their ordinary meaning." Koyo Seiko Co. v. United States, 36 F.3d 1565, 1571 n.9 (Fed. Cir. 1994).  Webster's Dictionary and Black's Law Dictionary define "likely" as probable.  See Webster's Ninth New Collegiate Dictionary, at 692 (1990); Black's Law Dictionary (6th ed., 13th reprint) at 834 (1998).  Under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984), the court must (1) determine whether the statute is ambiguous; and, if so (2) determine whether the agency's construction of the statute is reasonable.  The court determines that the statute is clear and, therefore, does not reach step two.  "Likely" means "likely" – that is, probable.  "Likely" is nowhere defined as merely "possible".

While the Final Determination does not provide a contrary construction, Duferco argues that the Commission implicitly interprets and applies the term "likely" to mean possible, not probable.  Plaintiffs argue that by emphasizing excess capacity without explaining why producers from Belgium would shift exports to United States, the Commission has, without more, only determined that imports are possible.[14]  Counsel for Defendant confuses the matter by arguing that likely does not mean probable.  Defendant cites the SAA which reads:

> The determination called for in these types of reviews is inherently predictive and speculative.  There may be more than one likely outcome following revocation or

---

[13]  Plaintiff Usinor incorporates Duferco's argument by reference.

[14]  Plaintiffs suggest that, among other things, recent changes in the European Community have made exporting to E.C. members more attractive than exporting to the U.S.

termination. The possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of dumping or countervailable subsidies, or injury, is erroneous, as long as the determination of likelihood of continuation or recurrence is reasonable in light of the facts of the case. In such situations, the order or suspended investigation will be continued.

SAA at 883. (emphasis added). The SAA cannot change the words of the statute. In any case, the SAA is not necessarily inconsistent with the statute. It may simply mean that different conclusions as to likelihood by commissioners or the court do not destroy a substantially supported conclusion as to likelihood. In the Final Determination, the Commission does not expressly address its understanding of the term "likely" or explain its application under the statute. Given counsel's argument and the Commission's emphasis on potential future volume of subject imports and the weakened state of the domestic industry, the court cannot determine whether the Commission determined competition overlap to be likely. As discussed, a determination based on a mere possibility would be counter to the clear meaning of the statute.[15] The court, therefore, remands the matter to the Commission to determine whether injury is likely, not just possible, and for further explanation of its findings.

### 2. Fungibility

Duferco argues that Belgian products are not fungible because it exported only [

] during the period of review and because no other subject country shipped [          ]. When asked about the interchangeability of Belgian plate with plate from the other subject countries, no U.S. producer reported a lack of interchangeability; importers responded similarly. Staff Report at PLATE-II-5. Only one U.S. producer out of ten responding reported any

---

[15] It is an overall determination of likely injury that is required. Certain subsidiary findings may be negative or neutral, but competition overlap is key.

differences other than price between Belgian plate and other subject imports.  Id. at PLATE-II-23.  The Commission noted that responding importers reported similarly.  Id. at PLATE-II-6.[16]  The court finds that the Commission cited ample support on fungibility.

### 3. Channels of Distribution

The Commission found that both domestic producers and importers ship plate to end users, distributors and service centers/processors.  Final Determination at 32; Staff Report at PLATE-II-1.  Duferco contends that the ITC erred because it never explicitly stated that there is likely to be overlap in channels of distribution, and never addressed the overlap with respect to Belgium specifically.  Duferco concedes, however, that it exports to end users.[17]  The other Belgian producer concedes that it shipped the majority of its plate to distributors, processors, and service centers.[18]  Thus, there appears to be no error in regard to channels of distribution.

---

[16] In addition to [                    ], Belgian producers manufacture standard, or commodity, plate.  Presently, a significant percentage of the plate products that Duferco manufactures are standard products.  Final Determination at 32 n.108.  [        ] percent of Belgium's plate production in 1999 was subject plate.  See Supplementary Material IV, C.R. Doc. 235, at CTL-SUPP-1.  Moreover, [                  ] represented only [       ] percent of Belgium's total plate shipments in 1999.  Id. at CTL-SUPP-13.

[17] Duferco's affiliated company, which is the exclusive importer of its products in the United States, shipped [        ] short tons of plate in 1997, [          ] short tons in 1998 and [          ] short tons in 1999.  See Duferco Importer Questionnaire Response, C.R. Doc. 334, at 8.

[18] Usinor stated that [      ] percent of its U.S. shipments went to distributors/processors/service centers in 1997, [      ] percent went to them in 1998 and [      ] percent went to them in 1999.  See Fabrique de Fer's Importer Questionnaire Response, C.R. Doc. 335, at 7.

*4. Simultaneous Market Presence and Geographical Overlap*

Duferco argues that the Commission's findings regarding simultaneous market presence and geographical overlap are pure speculation.   The Commission stated that:

> [t]he record is mixed regarding current market presence and geographic overlap with the orders in place.  However, in light of the importance of sales to steel service centers, which are dispersed throughout the United States and hold sizable plate inventories, we find it likely that subject imports from each subject country would be simultaneously present in the U.S. market as a whole and in the same geographical markets as other subject imports and the domestic like product.

Final Determination at 32-33 (footnote omitted).

With regard to market presence, the Commission cited to the Staff Report which states that subject plate imports from nine of the twelve countries at issue were present in the market throughout the period of review.  For two of the remaining three countries, Spain and Sweden, subject plate imports were present in two out of the three years comprising the period of review.  Subject imports from Taiwan were present in one year.  Staff Report at PLATE-IV-1.  With respect to geographic overlap, the Commission again cited the Staff Report and noted that both U.S. producers and importers reported nationwide sales.  Final Determination at 33 n.112 (citing Staff Report at PLATE-II-1).  According to the Staff Report, these producers and importers reported nationwide sales as a whole, although most individual firms reported a concentration of sales in particular regions.  Id.  The court finds that the Commission provided sufficient support for its findings in this regard.

### C. Conditions of Competition

In addition to competition overlap analysis, the Commission reviews the conditions of competition.

> [The] cumulation analysis in a five-year [sunset] review encompasses more than an examination of whether there would likely be a reasonable overlap of competition of the products in the U.S. market. To aid us in our decision whether to exercise our discretion to cumulate, we have also examined the overall similarities in the conditions of competition that would prevail if the finding and orders are revoked.

Certain Steel Wire Rope from Japan, Korea, and Mexico, USITC Pub. 3259 at 11. As discussed, sunset review analyses are inherently prospective, therefore, the Commission attempts to predict future conditions of competition. As with ordinary injury determinations, the statute does not enumerate what factors the Commission should consider in analyzing conditions of competition in sunset reviews.

Plaintiffs attack the affirmative competition overlap determination and conditions of competition analysis by arguing that the Commission did not fully explain why it was "likely" that Belgian and German producers would shift sales from Europe to the U.S. Both here and in the investigation below, Plaintiffs argued that the recent changes in the European Community have made it unlikely that Belgian and German producers would shift sales to the U.S.

In 1993, the European Community[19] created the European Single Market ("ESM"), which consolidated all of the Community's customs legislation into a single text and created a free trade

---

[19] The European Community presently has fifteen member states: Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden, and the United Kingdom. At the time of this opinion, the E.C. is preparing for the accession of thirteen (13) eastern and southern European countries: Bulgaria, Czech Republic, Cyprus, Estonia, Hungary, Latvia, Lithuania, Malta, Poland, Romania, Slovenia, Slovakia, and Turkey. Europa: The European Union On-Line, http://europa.eu.int/abc-en.htm (last visited on April 22, 2002).

zone among member countries. On January 1, 1999, the euro became the single currency for most member states in an attempt to further reduce the barriers to intra-community trade by eliminating the risk of exchange rate volatility.[20] The German Producers suggest that the ESM and euro effectively transformed the E.C. into one large "home market" for E.C. producers.

In the investigation below, the German Producers submitted extensive evidence that, because of developments in the E.C., the German CTL plate sales to other member countries had increased substantially since the investigation in 1993. See Prehearing Brief on Behalf of AG der Dillinger Hüttenwerke, Salzgitter AG Stahl und Technologie, Stahlwerke Bremen GmbH and Thyssen Krupp Stahl AG at 2-12 (Aug. 28, 2000), Pl. App. Tab 5 (hereinafter Prehearing Brief]). Between 1993 and 1999, the percentage of German CTL plate sales made to other E.C. members increased from 16.92% to 27.74%. Prehearing Brief at 20-21; see also Written Testimony of Klaus Heller Concerning German Cut-to-Length Plate Market at Figure 3 (Sept. 15, 2000). By 1999, almost 90% of German CTL plate sales were E.C. sales (combining sales to both Germany and other E.C. members). Id. at 21.

At roughly the same time, the U.S. producers' domestic market share grew from 84.1% (1992) to 93.2% (first quarter of 2000) during a period where U.S. consumption of CTL plate also grew significantly. Compare 1993 ITC Determination at C-3, Pl. App. Tab 1, with Revised Staff Report to the Commission at C-3 (Oct. 18, 2000) (hereinafter Revised Staff Report) (from 4,965,000 short tons in 1992 to over 6,000,000 by 1999). The German Producers attribute these

---

[20] On January 1, 1999, the euro became the currency for Belgium, Germany, Spain, France, Ireland, Italy, Luxembourg, the Netherlands, Austria, Portugal and Finland.

changes in the E.C. and U.S. to "an ever decreasing reliance [by the German Producers] on export sales outside of the European Community."

Although plaintiffs raised this argument below, the Commission dismissed these changes stating simply that "we are not convinced that there has been a shift of such fundamental nature as to make significant exports to the United States unlikely." Final Determination at 40, n. 155 (emphasis added). The Commission did not cite to any evidence in the Staff Report or elsewhere to support this finding. Plaintiffs argues that the Commission has improperly placed the burden on Plaintiffs to establish that future imports, and therefore future material injury, is not likely. Given the lack of clarity as to the Commission's definition of "likely," this may be so. In any case, the Commission has not addressed the material arguments of plaintiffs with respect to likelihood of competition overlap. See ALTX, Inc. v. United States, 167 F. Supp. 2d 1353, 1360 n.6 (Ct. Int'l Trade 2001) (stating that 19 U.S.C. § 1677f(i)(3)(B) requires that the Commission properly respond in the Final Determination to all relevant arguments raised by interested parties).

"In order to reach a judgment on the administrative record, the Court must have a basis for understanding the reasons for the Commission's actions." The Timken Co. v. United States, 20 CIT 1115, 1118 (1996). The court may not substitute its judgment for that of the agency. See Acciai Speciali Terni, S.p.A. v. United States, 19 CIT 1051, 1054 (1995). The court must, however, be able to reasonably discern that the Commission conducted its analysis in accordance with statutory requirements. See, e.g., Taiwan Semiconductor Indus. Ass'n v. United States, 59 F. Supp. 2d 1324, 1328 n. 7 (Ct. Int'l Trade 1999). "[W]here an explanation is lacking on the record, post hoc rationalization for the [Commission's] actions is insufficient" and remand may

be appropriate for further explanation. Timken, 20 CIT at 1118, 937 F. Supp. at 955. In view of the changes occurring in Europe since the 1993 investigation, the Commission should at minimum analyze the effects of those changes. On remand, the Commission should address Plaintiffs' arguments as to whether E.C. changes have affected conditions of competition significantly. In so doing, the Commission must determine whether, despite these changes, imports to the U.S. are likely to occur, and explain its reasons therefor. To the extent that these issues also affect the non-cumulation portion of the determination discussed infra, the same considerations apply.

## II. Other Aspects of the Likely Continuation or Recurrence of Material Injury Analysis

In sunset reviews, the Commission is required to determine whether revocation of antidumping or countervailing duty orders is likely to lead to a continuation or recurrence of material injury to the domestic industry. 19 U.S.C. § 1675a(a)(1). Pursuant to § 1675a(a)(1), the Commission analyzes the likely volume, price effect and impact of subject imports if the orders are revoked. Id. The German Producers challenge the Commission's affirmative determinations with respect to each.

### A. Volume

In finding that volume would likely be significant, the Commission noted that the excess capacity of the subject countries "greatly exceed[ed]" the volume of total subject imports in the 1993 investigations.[21] Final Determination at 39. The Commission found that foreign producers

---

[21] In 1992, the cumulated volume of all subject imports was 787,626 short tons. The German Producers argue that this amount is inflated and that 1992 imports from the cumulated countries amounted to 430,618. The Commission was, however, clearly referring to all cumulated imports. The point of this comparison was that the excess capacity of the cumulated

have an incentive to increase sales to maximize the use of available capacity. Id. at 42. In 1999, cumulated capacity to produce subject plate in ten of the subject countries was 11.5 million short tons, and excess subject capacity was 1.8 million short tons. Cumulated capacity to produce both subject and nonsubject plate was 13.4 million short tons, with excess total capacity being 1.9 million short tons. Id. at 39. The Commission noted that all producers of the cumulated subject imports, except those in Mexico, export substantial quantities of their production. Id. at 39-40 (citing Staff Report at PLATE-IV-3-4, 6-13). The Commission found it significant that a number of foreign producers were subject to antidumping and countervailing duty findings in other countries.[22] Final Determination at 40-41. The Commission discussed foreign plate inventories in making its finding on likely volume, noting that although importers reported no inventories of subject product, the cumulated subject foreign producers reported significant end-of-period inventories.[23] Id. at 40 n.154, 42. It explained that service centers were becoming increasingly consolidated and sought sources of low-cost supplies. Id. at 42.

The German Producers argue that the Commission's analysis "ignore[d] the fact that several countries, including Germany, were operating at very high levels of capacity utilization."

---

countries was greater than the sum of imports from all countries subject to cumulation in 1992. The ITC stated that it obtained this figure from official Commerce statistics. Staff Report at PLATE-I-1.

[22] Brazilian plate was subject to antidumping findings in Canada and Mexico and a countervailing duty finding in Mexico; Finnish plate was then subject to an ongoing antidumping investigation in Canada; Romanian plate was subject to an antidumping finding in the European Union; Spanish plate was subject to antidumping and countervailing duty findings in Canada. Final Determination at 41.

[23] Excluding Poland, there were 1,097,642 short tons in subject foreign producers' inventories in 1997, 1,009,785 short tons in 1998 and 949,568 short tons in 1999. Staff Report at PLATE-IV-3-4, 6-13.

German Producers Br. at 26. Between 1993 and 2000, German capacity for all cut-plate products, subject and non-subject, decreased greatly. Response to Posthearing Questions, Pl. App. Tab 9, Exh. 8.[24] Between 1992 and 1999, the German Producers reduced CTL plate production by over one million short tons. Staff Report at PLATE-II-5. During roughly the same period, German capacity utilization rates increased from 69.18% (1993)[25] to 95.36% (2000).[26] The German Producers calculate that unused capacity decreased very significantly between 1993 and 2000 .[27] Id. The German Producers argue that, because of the reduction in unused capacity, Germany had virtually no excess capacity for U.S. exports.

Defendant responds that the Commission did consider these changes but ultimately found the present excess subject capacity of the cumulated countries to be significant, especially when coupled with the ease with which product mix adjustments could occur, and afforded that fact more weight than it gave to the reduction in unused capacity. Final Determination at 39-40. In the Final Determination, the Commission acknowledged plaintiffs' argument that "demand conditions in a number of the subject countries may suggest a decreased level of cumulated imports," but went on to rely more heavily upon other factors.[28] Id. at 42. The Commission may

---

[24] Capacity decreased from [                ] to [                ] short tons during this period.

[25] Unused capacity in 1993 was  [            ] metric tons.

[26] Unused capacity in 2000 was [            ] metric tons.

[27] The German Producers calculate that unused capacity decreased from [                ] between 1993 and 2000 from [                    ] to [                    ].

[28] The Commission relied upon "significant capacity, and excess capacity, to produce both subject and non-subject plate products, foreign plate inventories, significant exports by most subject producers (sic)and barriers to exporting to third countries." Final Determination at 42.

weigh evidence as it sees fit. The same evidence may support a variety of findings. The court

finds no error in this finding in isolation.

**B. Price Effect**

The German Producers contest the Commission's determination with respect to the

likelihood of adverse price effects claiming that German CTL plate consistently exceeded the

price of domestically produced plate. The German Producers rely on pricing information from

the industry publication <u>Metal Bulletin</u> regarding U.S. import prices for heavy plate, which is

outside the scope of the orders.[29] Defendant responds that only one importer provided usable

pricing data to the Commission, and those data accounted for 37.5 percent of imports and such

imports were from Belgium only. Defendant argues that it would be unreasonable for the

Commission to extrapolate from data regarding non-commodity plate that is outside the scope of

the orders in order to draw conclusions regarding the prices of the commodity plate that is within

the scope. The court agrees with Defendant that it was reasonable for the Commission to afford

little weight to such incomplete pricing data and to rely instead on data from the original

investigation.

**C. Impact**

The German Producers argue that the Commission's impact determination was erroneous

because, they claim, it was based solely on the Commission's affirmative findings on volume and

price effects. In short, plaintiffs argue that the Commission conducted no analysis whatsoever

and that the affirmative determination was a foregone conclusion. Defendant responds by

---

[29] Germany manufactures [

                                                    ]. <u>Supplementary Material IV</u> at CTL-SUPP-17.

recounting the Commission's analysis, emphasizing the Commission's determination that the domestic industry was in a weakened state. Final Determination at 46. The Commission found that by the end of the review period, operating income had fallen, capacity utilization was low, production had decreased, inventories had increased, and that the number of production and related workers had decreased, along with their hours worked. Id. The Commission also found that capital expenditures had steadily declined. Based on the foregoing, the Commission found that the volume and price effects of the cumulated subject imports would likely have a significant adverse impact on the domestic industry and would likely cause the domestic industry to lose market share in the reasonably foreseeable future. Final Determination at 46-47. The court finds that the Commission did not err by analyzing potential impact in the context of likely volume and price effects. Of course, as with the Commission's findings on cumulation, these factors must be reviewed in the context of the proper standard, discussed supra Part I.

## III.  Facts Available

The German Producers' final argument challenges the Commission's reliance upon a limited number of questionnaire responses from U.S. producers. Plaintiffs argue that the Commission's information was incomplete because only twenty-two (22) of the one hundred and five (105) producers surveyed submitted responses to ITC questionnaires. Plaintiffs compare this return to that in Certain Cut-to-Length Plate From France, India, Indonesia, Italy, Japan, and Korea, in which 29 producers submitted information. USITC Pub. 3273 at III-1. Arguing that the majority of producers failing to respond were service centers, plaintiffs suggest that the domestic industry under-reported capacity, production, and shipment information. Plaintiffs

specifically point to a discrepancy between this review, in which reported U.S. consumption in 1998 was 8,222,194 short tons, and Certain Cut-to-Length Plate from France, in which reported U.S. consumption was 9,692,346 short tons for the same year.  Plaintiffs argue that the difference, almost 1.5 million short tons, is illustrative of overall under-reporting by the domestic industry.  Plaintiffs argue that the Commission should have resorted to other information as facts available pursuant to 19 U.S.C. § 1677e(a).

Although the Commission must obtain all accessible or obtainable information respecting the economic factors it uses for its analysis, this does not require "a level of diligence beyond that required by statute or the substantial evidence test." Allegheny Ludlum Corp. v. United States, 116 F. Supp.2d 1276, 1296 n.37 (2000).  Nonetheless, because this potentially significant discrepancy was pointed out by the parties, the Commission must make an effort to analyze it and weigh the evidence accordingly in conjunction with its overall remand analysis.

## CONCLUSION

For the reasons discussed, the court cannot sustain the Commission's Final Determination.  Because sunset reviews are prospective, the Act's statutory analyses require the Commission to predict whether future events are "likely." With regard to the definition of "likely," the court finds that the statute is clear.  On remand, the Commission must apply the common meaning of "likely" – that is, probable – in conducting the relevant sunset review analyses (cumulation and non-cumulation).   In support of any affirmative determinations, the Commission must cite to substantial evidence showing that its predictions are not only possible, but probable.  The Commission must specifically address Plaintiffs' argument that recent

developments in the European Community will deter German and Belgian producers from shipping subject imports to the U.S. To support an affirmative determination, the Commission must cite substantial evidence showing that injury from subject imports to the U.S. are likely despite these changes. The United States International Trade Commission shall issue its Remand Determination on or before July 1, 2002. Objections may be made within 20 days thereafter. Parties may submit comments on those objections within 10 days after objections are due.

_____

Jane A. Restani
JUDGE

Dated: New York, New York

      This 29th day of April, 2002